**Robert Owen McDONNELL a/k/a Joe Mack, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 71-1171.**

United States Court of Appeals, Eighth Circuit.

Feb. 16, 1972.

---

Charles Thompson, Pierre, S. D., for appellant.

David R. Gienapp, Asst. U. S. Atty., Sioux Falls, S. D., for appellee.

Before VAN OOSTERHOUT, ROSS and STEPHENSON, Circuit Judges.

ROSS, Circuit Judge.

This is an appeal from a judgment of conviction of Robert McDonnell under an indictment charging him with breaking and entering the Farmers State Bank of Mellette, South Dakota, with intent to commit larceny in violation of 18 U.S.C. § 2113(a). We reverse the judgment of conviction and remand the case for further proceedings consistent with this opinion.

The Farmers State Bank of Mellette was burglarized on May 18, 1969. On May 21, 1969, McDonnell, Danny Ward, and Clarence Byrd were apprehended in Merriman, Nebraska in the commission of a burglary, and a 1968 Plymouth car bearing Idaho license plates was discovered nearby. A search of McDonnell produced the keys to the car, which was then towed to Valentine, Nebraska. The sheriff, James M. Ward, obtained a search warrant on the basis of his affidavit and proceeded to search the car.

On September 5, 1969, McDonnell was charged in United States District Court in Nebraska with entry and attempt at entry of the Bank of Brady, Nebraska. He filed a motion to suppress the evidence taken in the search of the automobile at Valentine, Nebraska hereinbefore mentioned. Judge Urbom sustained the motion in part, denied it in part, and granted the Government ten days within which to file a request for rehearing for the purpose of presenting facts as to whether certain tools were in fact "burglary tools" as set out in the search warrant. United States v. McDonnell, 315 F.Supp. 152, 170–171 (D.Neb.1970). After a subsequent hearing, but before final adjudication of the motion to suppress, the Government dismissed the Nebraska indictment.

McDonnell was indicted in South Dakota in this case on February 11, 1970, at which time he was being held at the Nebraska State Penal Complex at Lincoln, Nebraska on a state charge. On July 21, 1970, McDonnell was arraigned and an attorney was appointed to represent him. Then, on July 27, 1970, that attorney filed a motion to suppress the evidence obtained in the search of the Plymouth car in Valentine on May 22, 1969. The hearing on this motion to suppress was held December 4, 1970, at the conclusion of which the court reserved ruling. On January 21, 1971, the motion to suppress in this case was finally denied. An amended motion to suppress, filed January 25, 1971, was denied orally at the trial which commenced on that date.

At McDonnell's trial in this case, Danny Ward testified on behalf of the Government to the effect that he, Byrd and McDonnell all participated in the burglary at Mellette. However, on cross-examination, he stated that he couldn't state for certain that McDonnell was with him during the Mellette burglary. Certain tools and other items taken from the car in the search at Valentine were introduced into evidence together with McDonnell's shoes and photographs of the footprints at the scene of the crime, all over strenuous objection by McDonnell's counsel. The testimony of Danny Ward, together with photographs of footprints at the scene of the crime and the shoes taken from McDonnell in Valentine were the only items of evidence which directly linked McDonnell to the burglary at Mellette. Near the end of the trial, the defendant placed into evidence the shoes of Danny Ward which were almost identical to the shoes of McDonnell.

On this appeal, McDonnell advances five principal arguments:

    I.  Where there was no evidence connecting the defendant's shoes with the photographs of footprints found at the scene of the alleged crime, the court committed reversible error in allowing

the photographs and the defendant's shoes to be admitted in evidence.

II. The court committed reversible error when it let in certain evidence over the defendant's objections, and when the court denied the defendant's motion to suppress.

III. The court committed reversible error when it denied the defendant's motion to suppress and allowed in evidence, on which the issue of admissibility had already been adjudicated in a federal district court.

IV. Where the defendant was deprived of his right to a speedy trial, his conviction in this proceeding must be overturned and reversed.

V. The court erred in not granting a new trial when it was shown that the defendant was exhibited before three jurors in the lobby of the courthouse, in handcuffs and chains.

## I. ADMISSION OF SHOES AND PHOTOGRAPHS OF FOOTPRINTS

At the time of their arrest, four days after the Mellette bank was burglarized, McDonnell and Danny Ward were both wearing shoes of the same type, brand, and approximate size. The shoes, crepe-soled "Porkies by Kinney," were taken from McDonnell and Danny Ward at that time and forwarded to the FBI for analysis. When it became apparent that McDonnell's shoes were to be introduced into evidence together with the photographs of the footprints found at the scene of the crime, McDonnell's counsel, on two different occasions, objected to the the introduction of the shoes and advised the trial court in chambers that the FBI report which had been furnished to McDonnell indicated that the FBI could not specifically connect up the shoes with the footprints. The FBI report, which was read to the court, indicated that while it was not

possible to definitely associate the shoe prints with the shoes, the prints submitted were the same design as the shoes taken from both Danny Ward and McDonnell.

Counsel argued to the court that because Danny Ward admittedly was in the Mellette bank at the time of the burglary and was probably then wearing exactly the same type of shoes as those taken from McDonnell in Valentine, in the absence of some proof that the footprints in the photo were from the shoes owned by McDonnell rather than the shoes owned by Danny Ward, the admission of the shoes into evidence was erroneous and highly prejudicial to his client. The trial court overruled the objection and received the shoes.

The only testimony offered regarding the footprints was that of the criminal investigator who had photographed the particular prints because he felt they were "distinctive" and "unique." No attempt was made to compare the photographs of the footprints with the shoes.

In his final argument, the Government prosecutor acknowledged that there was no expert testimony linking the shoes with the footprints and in response to a question posed by McDonnell's attorney as to why no such expert was produced, made the following statement:

"Mr. Maynes says, 'ask the United States Attorney why there wasn't an expert?' and he made certain suggestions. Ladies and gentlemen, the reason there wasn't an expert is that they sent us the wrong expert—they sent the wrong man—great big government, with all its powers and all its resources, boo-bood. Now what about all this power and all these resources—these resources and powers are as available to the defendant under our system as they are to us. He has the right to call upon us for everything. Remember who produced these shoes—the Federal Government has the obligation of producing them for the defendant. The resources are as available to this defendant as they

are to me under our system. But now we get the shoes—let's look at them because it has been made an issue. Here is a picture of one of the shoeprints taken outside the bank. This is not actual size—you will notice when you look at this, which is Govt. Ex. 36, you will notice the shoe begins almost on the one-inch mark and where it ends, well, it runs off the page; you will notice that it is worn, and you will notice what appears to be an indentation in that portion—you can observe that for yourselves and you can observe these shoes. You will notice the shoes of the defendant, being Exs. 54 and 54–A, are worn in about the same place—you can look at that for yourselves; you will notice they are not exactly the same size because this isn't—you can compare the size of those, you are familiar with how long an inch is and you can call on your own recollection of that and you can fit it in your mind; you can look at these shoes off Mr. Ward that aren't worn in those areas, and you can look at the size of these shoes. I am not asking you to base your conviction on these shoes. I think it would be wrong because we didn't have an expert here. Sometimes those things happen, but seeing as how it was brought up, I wanted to call it to your attention and answer the charges."

Thus, the prosecutor not only implied that expert testimony was available to link up the shoes with the footprints and wasn't produced because of a mistake, but also went ahead and provided his version of that missing expert testimony in his final argument. Earlier, the prosecutor had not challenged the statement McDonnell's counsel read to the court from the FBI report that it was not possible to definitely associate the submitted shoe prints with the shoes.

The Government cites the case of *McClard v. United States*, 386 F.2d 495 (8th Cir. 1967), as authority for its contention that the shoes and photographs of the footprints were admissible. However, in *McClard*, the Government had adduced evidence showing that the defendant was in the area of the bank just prior to and subsequent to the burglary; and expert testimony was provided to show that the boot prints found were of the same size, design and had the same wear characteristics as the boot of the defendant. Moreover, there was no evidence to indicate that another person, admittedly in the area, was wearing identical boots.

The Government also relies upon *Downey v. United States*, 263 F.2d 552 (10th Cir. 1959). In that case, however, the Government offered evidence showing that the shoes worn by the defendant bore a bell-like heel imprint found on Goodrich rubber heels and that the shoes of the defendant matched the imprint.

██ It is competent to present to the jury the character of footprints and shoes only where it has been established that the footprints and shoes are distinctive enough to afford reliable comparison. *See e. g.*, State v. Hall, 286 Minn. 424, 176 N.W.2d 254, 259–260 (1970); State v. Sigman, 220 Iowa 146, 261 N.W. 538, 539 (1935); Harding v. State, 122 Neb. 766, 241 N.W. 526, 527 (1932); State v. Burch, 195 Iowa 427, 192 N.W. 287, 290–291 (1923); Kinnan v. State, 86 Neb. 234, 125 N.W. 594, 595 (1910). Such comparison is essential to show a connection between the defendant and the prints, thereby providing the relevancy required for admission into evidence. Here, such proof was not offered, and in light of the additional distinct possibility of a similar shoe making the print, it was error to admit McDonnell's shoes and the photographs of the footprints into evidence.

██ The introduction of Danny Ward's shoes into evidence, by McDonnell, did not cure the error or waive his right to have the evidence excluded. Once the improper evidence was admitted, counsel for McDonnell had no choice but to attempt to show that the footprints in the photographs could have been made by shoes worn by Danny Ward rather than McDonnell. *Cf.* Unit-

ed States v. Straughan, 453 F.2d 422, 428 (8th Cir. 1972).

## II. PREJUDICIAL ERROR

The proper standard for determining whether or not the admission of the footprints and shoes heretofore discussed was prejudical or harmless was discussed by the Supreme Court in Kotteakos v. United States, 328 U.S. 750, 764–765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946), as follows:

> "If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand * * *. But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. * * * *"

And in Herrington v. California, 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969), the Court again discussed the harmless error doctrine in the following words:

> "We of course do not know the jurors who sat. Our judgment must be based on our own reading of the record and on what seems to us to have been the probable impact of the two confessions on the minds of an average jury."

■ In this case, the only direct evidence which tended to prove that McDonnell was in the Mellette bank at the time of the robbery was the testimony of Danny Ward, the photographs of the footprints and his shoes. On cross-examination, Danny Ward admitted that he wasn't certain that McDonnell participated in the robbery. Under these circumstances, we cannot say with assurance that the erroneous admission of the photographs of the footprints and the shoes did not sway the jury in its determination of guilt. In making this determination, our judgment is based upon our own reading of the record and upon what seems to us to have been the probable impact of the admission of this evidence on the minds of an average jury. We therefore hold that the admission of these items of evidence was prejudicial and requires a new trial.

## III. SEARCH AND SEIZURE

### A. Res Judicata

■ McDonnell claims that the ruling, concerning suppression of evidence seized in the search of the car at Valentine, made by Judge Urbom in the Nebraska case, United States v. McDonnell, *supra,* is res judicata as to the motion to suppress in this case. This contention is without merit.

The ruling made by Judge Urbom was clearly not a final and appealable order. Indeed, the ruling made by Judge Urbom contemplated the taking of additional testimony to determine whether certain tools found in the search could be considered burglary tools as described in the warrant. Apparently such additional testimony was taken, but before a revised ruling could be made, the Government dismissed the Nebraska indictment. Even if the second ruling had been made in the Nebraska case, the order on the motion to suppress would not have been an appealable order, regardless of the fact it was rendered in a different district from that of trial. DiBella v. United States, 369 U.S. 121, 82 S.Ct. 654, 7 L.Ed.2d 614 (1962) (pre-indictment order); Carroll v. United States, 354 U.S. 394, 77 S.Ct. 1332, 1 L.Ed.2d 1442 (1957) (post-indictment order).

■ Before res judicata can be invoked, there must be a final judgment; a mere interlocutory decree does not afford a basis for the plea.

> "While a judgment in an independent plenary proceeding for return of property and its suppression as evidence is final and appealable and the scope of relief in such a case may extend far beyond its effect on a pending trial, a decision on a motion to re-

turn or suppress evidence in a pending trial may be no more than a procedural step in a particular case and in such event the effect of the decision does not extend beyond that case." 1B MOORE'S FEDERAL PRACTICE ¶ 0.409 [1], at 1004 (2d ed. 1965). *See* United States v. Wallace & Tiernan Co., 336 U.S. 793, 800–802, 69 S.Ct. 824, 93 L.Ed. 1042 (1949).

### B. Burglary Tools

■ McDonnell's contention that the evidence seized was not particularly described in the warrant is without merit as it relates to the burglary tools discovered in the search. In the Nebraska case, Judge Urbom granted the Government a rehearing so that additional facts relating to "miscellaneous tools" and "miscellaneous hand tools" could be produced to determine whether or not they were actually burglary tools as described in the search warrant. At the trial in this case, prior to the admission of these exhibits, the Government did present testimony from Danny Ward that these tools were in fact burglary tools, most of which had been used as such in the Mellette bank burglary. At the hearing on the motion to suppress, it presented evidence from Sheriff James Ward to show that the tools were found in the car at the time of the original search. Under these circumstances, it is clear that the items identified at trial as burglary tools were taken pursuant to a search warrant describing them as burglary tools and were properly admitted into evidence.

### C. Maps and Parcel Post Labels

The Government introduced into evidence Exhibit 51, which was a map of an area, including Mellette, South Dakota, and which was found in the car during the search at Valentine. This map had a mark around Hitchcock, one around Mellette, and one around a place called Wessington, and below that was written "needs case" and "very good." Ward testified that the markings were made by Clarence Byrd. Also intro-

duced into evidence were another map and some parcel post labels bearing McDonnell's fingerprints found in the glove compartment of the car during the search.

The presentation of these items into evidence added little to the Government's case against McDonnell. In view of our determination in part II of this opinion that a new trial is necessary because of the erroneous admission into evidence of the shoes and the photographs of the footprints, we do not specifically reach this issue in this opinion; but we do express some reservation concerning both the admissibility and the necessity of the use of this evidence. *See* Coolidge v. New Hampshire, 403 U.S. 443, 466–467, 91 S.Ct. 2022, 29 L.Ed.2d 364 (1971), and Warden v. Hayden, 387 U.S. 294, 306–307, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967).

■ We have carefully examined the other allegations of McDonnell, including those advanced by him in a lengthy pro se supplemental brief, and have found them to be without merit. The allegation of the deprivation of a speedy trial must be considered in the light of the record not only of this case but the other cases in state and federal courts in Nebraska, pending against McDonnell at that time. Although McDonnell was arrested in Nebraska in May of 1969, he was not indicted on this charge until February 11, 1970. Because he was being held in the Nebraska State Penal Complex, he was not arraigned immediately. On June 16, 1970, McDonnell filed a motion to dismiss "because of the long lapse of time between defendant's indictment and his trial" even though only four months had elapsed. The Government then took steps to have him arraigned, which was done on July 21, 1970. Several motions were filed by McDonnell's court appointed attorney, a hearing on his motion to suppress was held December 4, 1970, and the trial commenced on January 25, 1971. Under these circumstances, there was not such a delay to constitute a denial of a speedy trial guaranteed by the Sixth Amend-

**98**

ment. *See* United States v. Ewell, 383 U.S. 116, 120, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966).

The allegation that a new trial should have been granted because McDonnell was seen by three jurors while in handcuffs and chains need not be considered in view of the disposition we make of this case on other grounds.

Reversed and remanded for a new trial.