**UNITED STATES of America,
Appellee,**

v.

**Raymond Louis STABLER, Appellant.**

**No. 73–1261.**

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 17, 1973.

Decided Jan. 8, 1974.

---

John C. Mitchell, Omaha, Neb., for appellant.

William K. Schaphorst, U. S. Atty., Omaha, Neb., for appellee.

Before HEANEY, ROSS and STEPHENSON, Circuit Judges.

HEANEY, Circuit Judge.

Raymond Louis Stabler, an eighteen-year-old enrolled member of the Omaha Indian Tribe of Nebraska, was indicted for the first degree murder of Dennis Kenton Thomas, also of the Omaha

Tribe, on the Omaha Reservation in violation of 18 U.S.C. §§ 1111 and 1153. He was tried before a jury, found guilty of second degree murder and sentenced under the Youth Corrections Act for treatment and supervision for fifteen years or until discharged. From that judgment, the defendant brings this appeal.

On the morning of September 19, 1972, a burning car with a dead body in it was found on the reservation near the Mormon Church in Macy, Nebraska. The body was burned severely and was not identified.

On September 18, Christine Mitchell, Leon Thomas and Dennis Thomas had been drinking heavily in several towns in the area, using Christine Mitchell's car for transportation. A number of friends and relatives joined and left the group at various times; but late that evening, the Thomases, Mitchell and two twelve-year-old children returned to Macy. The car stalled before reaching Macy, and was pushed to that community and left near the Mormon Church. Christine Mitchell, Leon Thomas and the two children left the car at that point. There is some evidence that Dennis Thomas had passed out in the car before reaching Macy, but the evidence is conflicting as to whether he remained in the car after the others left.

On September 18, the defendant was also drinking heavily with another group. Their drinking took place principally in the home of the defendant's sister, Arlene Grant. That night, as the group returned on foot to Arlene Grant's after securing more liquor, they saw an automobile parked near the Mormon Church. They stopped and observed that someone was in the back seat of the car. The defendant opened the door of the parked car and peered inside. He may or may not have searched the pockets of the occupant. The car was discovered burning four or five hours later.

On September 21, 1972, Officer Lawrence Gilpin of the Bureau of Indian Affairs arrested the defendant on a charge unrelated to this case. When apprehended, the defendant volunteered to Gilpin that he had killed Dennis Thomas and set fire to the car. He was taken to the Macy jail and, subsequently, gave full confessions to Officer Delmer K. Eastman of the Bureau of Indian Affairs and to F.B.I. agents. At trial, the defendant admitted making the confessions, but disavowed their content.[1]

On appeal, the defendant alleges thirteen separate errors by the trial court as grounds for the reversal of his conviction. We need only consider three in detail: (1) that the court erred in admitting testimony concerning footprints; (2) that the court erred in admitting a certain bloodstained jacket; and (3) that the court erred in denying defendant's motions for acquittal. We reverse and remand.

---

1. The defendant stated that he decided to lie about killing Dennis Thomas because he didn't "like to stay in Macy" and he couldn't find a job. He thought that by confessing to the murder, he could go "back to Kearney," a training school he had spent time in and apparently enjoyed. He testified that he decided not to take the "rap", "[b]ecause I don't want to go to the penitentiary the rest of my life."

Beverly Tupper Mead, a psychiatrist who examined the defendant, offered the following opinion:

* * * [The defendant] certainly has had it, as the expression goes, up to here. He's totally disenchanted and unhappy with the Macy living situation. It has been something—a bad experience all of his life, and particularly terrible experience for the past six years. And in talking to him about the many times that he has gone to jail, which didn't seem to bother him at all as long as he was away from Macy, and his times in Kearney, which seem to be rather the more pleasant periods of his life. I can imagine that if being kept in Kearney is more pleasant than your own home that one would certainly be motivated to do any number of things, including falsifying information to try to get away from an unhappy home situation; perhaps I might even say an almost intolerable home situation.

*The Footprints in the Cornfield.*

■ Two government witnesses testified that they found footprints in a cornfield adjacent to the Mormon churchyard two days after the fire occurred. No casts were made of the tracks and no photographs of them were taken. The witnesses both conceded that there was no way to identify the prints as belonging to the defendant. Moreover, one government witness admitted on cross-examination that there "was a large crowd" present at the scene after the fire on September 19, and the area was not roped or fenced off. The trial court appears to have permitted the testimony on the theory that it tended to corroborate a statement by the defendant to law enforcement officers that after setting the car on fire, he ran into a cornfield. The trial court stated:

> The jury will understand that this witness has not testified, and you are not to consider that any footprints which were observed in the cornfield were made by the defendant. The fact that there were footprints as opposed to an absence of footprints, however, I leave to you for your consideration.

In our view, it was error to admit the testimony. We said in McDonnell v. United States, 455 F.2d 91, 95 (8th Cir. 1972):

> It is competent to present to the jury the character of footprints and shoes only where it has been established that the footprints and shoes are distinctive enough to afford reliable comparison. * * * Such comparison is essential to show a connection between the defendant and the prints, thereby providing the relevancy required for admission into evidence.

We see no reason to depart from that reasoning here. The offered evidence had only one purpose and that was to persuade the jury that the footprints were those of the defendant. The fact that the evidence would also tend to corroborate the defendant's confessions is

no reason for departing from *McDonnell*. To do so would lead to the absurd result that irrelevant and highly prejudicial evidence could be used to corroborate a confession and, thus, increase the probability of conviction, while it could not be used to support a conviction absent a confession.

*The Bloodstained Jacket.*

■ F.B.I. Agent Earl J. Webb testified that on September 21, 1972, the defendant stated that he was wearing "an army field jacket" on the night of the fire, but that his brother now had it. A police officer obtained an army field jacket from the defendant's brother and the defendant identified it in the presence of Agent Webb. At trial, the defendant denied that he had ever worn the jacket. The trial court admitted the jacket over the objection of the defendant. Agent P. Rene Bidez, Chief of the F.B.I. Serology Unit, testified that he examined the jacket and found a ½ by 1/16th inch human bloodstain (less than two milligrams of blood) on the right cuff. He stated that all the blood was consumed in the experiments conducted to determine if the blood was of human origin and, therefore, "there was no grouping made." This testimony was allowed over the defendant's objection. The defendant's expert, Dr. Irving H. Bernstein, testified that even the small quantity of blood found on the jacket "could have been typed for grouping." The only evidence connecting the defendant with the jacket was his confession. The government did not introduce any other evidence which tended to establish that the defendant had worn the jacket on the night of the fire or that he had ever worn the jacket. The government argues that the jacket and the testimony of Agent Bidez were offered to corroborate the defendant's confessions. These confessions included the assertion that he had stabbed Dennis Thomas in the neck before setting fire to the car. There was no physical evidence, how-

ever, which indicated that the occupant of the car had been stabbed.[2]

In light of all the circumstances, we feel that it was error to admit the jacket and to permit Agent Bidez to testify that he found blood on the right cuff of the jacket. Not only was the evidence of doubtful relevancy, but its probative value was substantially outweighed by the danger of unfair prejudice to the defendant. *See*, Proposed Federal Rules of Evidence 401 and 403, 56 F.R.D. 194, 215 (1972). There was no independent evidence tying the defendant to the jacket, the jacket to the scene of the fire, or the bloodstain on the jacket to the body removed from the car. To the contrary, available witnesses were not questioned as to whether the defendant was wearing *the jacket on the night of the fire*, and the defendant's brother was not questioned as to when, if ever, the jacket was returned to him. The "bloodstained cuff" was clearly the most persuasive independent evidence linking the defendant with the crime. Yet, because the substance was consumed in the government's tests, the defendant was deprived, albeit unintentionally, of the opportunity to prove either that there was no blood on the cuff or if there was, that it was neither his nor the decedent's.

■ We are left then with the question of whether the errors in admitting evidence as to the bloodstained jacket and the footprints require a reversal. We feel they do.

If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand * * *. But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

Kotteakos v. United States, 328 U.S. 750, 764–765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). Applying the above standard, we cannot say that these errors were harmless.

*Denial of the Defendant's Motions for Acquittal.*

■ The defendant contends that there was not substantial independent evidence to corroborate his confessions and admissions and that, therefore, the trial court erred in denying his motions for acquittal.

It is a settled principle of the administration of criminal justice in the federal courts that a conviction must rest upon firmer ground than the uncorroborated admission or confession of the accused. We observed in Smith v. United States, 348 U.S. 147, 153, [75 S.Ct. 194, 197, 99 L.Ed. 192,] that the requirement of corroboration is rooted in "a long history of judicial experience with confessions and in the realization that sound law enforce-

---

2. Richard B. Wilson, the doctor who performed the autopsy, testified as follows:

Q. Was there anything around the tissue of the neck that would indicate any type of entry into the body?

A. No, sir; not that I could detect.

Q. So that we understand that, Doctor, your answer is that you could see no incision, no insertion of any foreign body into the neck tissue?

A. I could not.

Q. And if there had been there was enough of the tissue of the neck left so that you could have disclosed that—or found that?

A. No, sir, I would say not. There was virtually nothing left but the bony tissues and muscular tissue that had shrunken down against the neck; but the anterior or front tissue, including the larynx and the entire face, were absent; so the soft tissue damage could not be detected by me.

ment requires police investigations which extend beyond the words of the accused." In Opper v. United States, 348 U.S. 84–90, [75 S.Ct. 158, 162–163, 99 L.Ed. 101,] we elaborated the reasons for the requirement:

"In our country the doubt persists that the zeal of the agencies of prosecution to protect the peace, the self-interest of the accomplice, the maliciousness of an enemy or the aberration or weakness of the accused under the strain of suspicion may tinge or warp the facts of the confession. Admissions, retold at a trial, are much like hearsay, that is, statements not made at the pending trial. They had neither the compulsion of the oath nor the test of cross-examination." (Footnote omitted.)

Wong Sun v. United States, 371 U.S. 471, 488–489, 83 S.Ct. 407, 418, 9 L.Ed. 2d 441 (1963).

■ It is also settled that:

Where the crime involves physical damage to person or property, the prosecution must generally show that the injury for which the accused confesses responsibility did in fact occur, and that some person was criminally culpable. A notable example is the principle that an admission of homicide must be corroborated by tangible evidence of the death of the supposed victim. See 7 Wigmore, Evidence (3d ed. 1940, § 2072, n. 5. There need in such a case be no link, outside the confession, between the injury and the accused who admits having inflicted it. * * *

Id. at 490, n. 15, 83 S.Ct. at 418.

■■ In view of these standards, we cannot say as a matter of law that the defendant's confessions were not corroborated. However, there is no merit to the government's argument that a confession or an admission may be used here to corroborate other admissions or confessions. See, United States v. Calderon, 348 U.S. 160, 75 S.Ct. 186, 99 L.Ed. 202 (1954); Gulotta v. United States, 133 F.2d 683 (8th Cir. 1940). Yet, if the record is viewed in the light most favorable to the government, it can be said that there was other evidence from which the jury could have found that Dennis Thomas was dead and that his death was caused by a criminal act. The body was identified as a human body. Thomas was last seen in the car and has not been seen in the community since the fire. The car was parked long enough for it to become cool and negate the possibility that an operating defect caused the fire. Dennis Thomas did not smoke and was comatose when last seen.

■ We recognize that none of the stated independent evidence associates the defendant with the commission of the crime. Such was unnecessary in this case. See, Wong Sun v. United States, supra, 371 U.S. at 490, n. 15, 83 S.Ct. 407, 9 L.Ed.2d 441. This is not to say that the jury was required to find corroboration here, only that it could do so. It follows that the defendant was not entitled to a judgment of acquittal.

The defendant also contends that: (a) his confessions were not voluntary; (b) he was not expeditiously brought before the nearest available magistrate; (c) the court erred in denying his objections to the testimony of Agent Eastman; (d) the court erred in allowing the "coerced" testimony of Jesse Woodhall; (e) the government failed to comply with the court's order to produce all confessions made by the defendant; (f) the government's compliance with the court's order to produce the results of all examinations conducted was not timely; and (g) the court erred in allowing the government to conduct certain experiments in the presence of the jury.

■ The defendant's confession to Officer Gilpin was spontaneous and, therefore, admissible. See, Gilpin v. United States, 415 F.2d 638, 639 (5th Cir. 1969). The other confessions were given after the officers gave warnings in compliance with Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Although questions of the defendant's ability to understand the warnings and, thus, to intelligently

waive constitutional rights were raised, we are unable to say that the trial court's findings of voluntariness are clearly erroneous.

The defendant was brought before a magistrate within thirty-six hours of his arrest. Under the circumstances presented by this case, the delay was not unreasonable.

We have examined the remaining contentions of the defendant. We find that in each instance, the claim is either without merit or the error is harmless.

Reversed and remanded.

STEPHENSON, Circuit Judge (dissenting).

I respectfully dissent. It is my view that the trial court did not abuse its discretion in admitting testimony concerning footprints and the bloodstained jacket which appellant confessed he was wearing at the time he burned the car and killed the victim. I would affirm the conviction.

Special Agent Webb of the Federal Bureau of Investigation testified that appellant during the course of his confession[1] related that: when he entered the parked car the victim, Dennis Thomas, was lying down on the back seat apparently sleeping; he tried to turn the victim over "so that he could see if he had a wallet and take his money;" "he stabbed Thomas in the neck;" "he didn't bleed too much;" appellant then started a fire in the car, closed the door and ran into a nearby cornfield to a large block house (cistern) upon which he climbed and watched the fire.

During the course of the confession appellant accompanied agents Webb and Oxler to the scene where Webb testified appellant "showed us the direction of travel that he took" through the cornfield to the cistern; he described the clothing he wore the night of the murder which included a field jacket that was obtained from appellant's brother and identified by appellant as the one he was wearing. The jacket was sent to the F. B.I. laboratory and a witness testified that a stain on the jacket cuff was human blood.

On cross-examination Agent Webb testified "Well, the only set of footprints we found was one set, and they led in the general direction from the area of the car in a circular manner towards the cistern." He conceded there was no way to identify the footprints, they varied, they started in the area where appellant indicated he ran into the cornfield, but there was no continuous pattern. The footprints were not identifed as having, been made by appellant and the able trial court so cautioned the jury and instructed the jury that the testimony was to be considered only for its bearing on the issue of the presence or absence of footprints.

In McDonnell v. United States, 455 F. 2d 91, 95 (C.A.8 1972), cited by the majority, the footprints were offered as independent evidence of defendant's presence in the bank. In the instant cause they were offered for the purpose of corroborating appellant's confessions which at trial he admitted making but claimed were a sham. The absence of footprints would have made appellant's confession suspect, their presence and location were consistent with his confession. To that extent they were relevant and admissible.

Similarly the jacket which appellant confessed he wore during the stabbing and the expert testimony that the stain thereon was human blood was properly admitted to corroborate appellant's statement that he stabbed the victim and the victim bled albeit not "too much." The evidence concerning the jacket was

---

1. Appellant was interviewed by Special Agents Webb and Oxler in the Tribal Police Department building after he had earlier confessed to Agent Gilpin, Special Deputy with the Bureau of Indian Affairs, and subsequently to Delmer Eastman, Criminal Investigator for the Bureau of Indian Affairs, that he had killed the victim and set fire to the car. In addition to the foregoing confessions appellant made admissions of guilt to three other persons who were not law enforcement officials.

obviously introduced to establish the trustworthiness of appellant's confessions. It was relevant for that purpose.

The Supreme Court has made it clear that the "corpus delecti" may be established by independent evidence of the crime and by corroborating the confession so that in effect the evidence speaks through the confession. In Smith v. United States, 348 U.S. 147, 156, 75 S.Ct. 194, 199, 99 L.Ed. 192 (1954) Mr. Justice Clark speaking for the court stated the rule as follows:

> All elements of the offense must be established by independent evidence or corroborated admissions, but one available mode of corroboration is for the independent evidence to bolster the confession itself and thereby prove the offense 'through' the statements of the accused.

In Opper v. United States, 348 U.S. 84, 93, 75 S.Ct. 158, 164, 99 L.Ed. 101 (1954) Mr. Justice Reed speaking for the court summarized the rule as follows:

> However, we think the better rule to be that the corroborative evidence need not be sufficient, independent of the statements, to establish the *corpus delicti*. It is necessary, therefore, to require the Government to introduce substantial independent evidence which would tend to establish the trustworthiness of the statement. Thus, the independent evidence serves a dual function. It tends to make the admission reliable, thus corroborating it while also establishing independently the other necessary elements of the offense. Smith v. United States, *post*, [348 U.S.] 147 [75 S.Ct. 194, 99 L. Ed. 192]. It is sufficient if the corroboration supports the essential facts admitted sufficiently to justify a jury inference of their truth. Those facts

plus the other evidence besides the admission must, of course, be sufficient to find guilt beyond a reasonable doubt.

*See discussion*, McCormick, Law of Evidence § 158 at 346–49 (2d Ed. 1972).

We have recognized that it is appropriate to receive evidence for the purpose of establishing the trustworthiness of a confession. Gerberding v. United States, 471 F.2d 55, 61 (C.A. 8 1973); Fisher v. United States, 324 F.2d 775 (C.A. 8 1963). The details of the confession often supply the basis for the relevancy of the evidence. *Fisher, supra*; United States v. Abigando, 439 F.2d 827 (C.A. 5 1971); United States v. Demangone, 456 F.2d 807 (C.A. 3 1972); United States v. Waller, 326 F.2d 314 (C.A. 4 1963); Mapys v. United States, 409 F.2d 964 (C.A. 10 1969); Hagan v. United States, 245 F.2d 556 (C.A. 5 1957); Gallegos v. States, 152 Neb. 831, 43 N. W.2d 1 (1950).

We have subscribed to the rule that the trial court will be accorded wide latitude in passing on the admissibility of evidence. The exercise of this discretion will not be disturbed absent a clear showing of abuse. Wangrow v. United States, 399 F.2d 106, 115 (C.A. 8 1968); Cotton v. United States, 361 F.2d 673 (C.A. 8 1966); *compare*, United States v. Ravich, 421 F.2d 1196, 1203–1205 (C. A. 2 1970).

I fail to find an abuse of discretion on the part of the trial court in admitting the testimony concerning the footprints in the cornfield and the bloodstained jacket. Here the trial court was in a position to weigh the probative value of the evidence against possible prejudice in its admission. I see no reason to interfere.

I concur with the majority opinion in all other respects.