UNITED STATES of America, Appellee,

v.

**Jack ROSE, Appellant.**

**No. 83–1290.**

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 17, 1983.

Decided April 2, 1984.

Rehearing Denied May 3, 1984.

Robert G. Ulrich, U.S. Atty., Kansas City, Mo., for appellee.

Willard B. Bunch, Campbell, Erickson, Cottingham, Morgan & Gibson, John Edward Cash, Kansas City, Mo., for appellant.

Before ROSS, ARNOLD, and BOWMAN, Circuit Judges.

BOWMAN, Circuit Judge.

A jury found appellant Jack Rose guilty of armed robbery of the Kansas City Post

Office Employees Credit Union in violation of 18 U.S.C. § 2113(a) and (d). Rose was sentenced to twenty years in prison. On appeal, he seeks reversal of his conviction on several grounds. First, Rose contends that the district court erred in admitting evidence seized from his person subsequent to his arrest because the arrest was made without probable cause. Second, Rose argues that evidence seized from the trunk of the car he was riding in at the time of the arrest should have been suppressed because it was obtained pursuant to an invalid search warrant. Third, he argues that an admission allegedly made to two bondsmen who arrested him on an unrelated charge should have been suppressed because the bondsmen failed to give a *Miranda* warning or because of the coercive nature of his arrest and custody.[1] Fourth, Rose challenges the competency of evidence offered by the government to show that a shoeprint "lifted" from the credit union counter was made by a shoe seized from him. Fifth, Rose maintains that he was deprived of one of his ten peremptory strikes. Finally, Rose submits that the government failed to prove that he committed assault or placed another person's life in jeopardy as required by 18 U.S.C. § 2113(d). We reject these contentions and affirm the conviction.

## I. *Facts*

Detective Paul Ericsson of the Kansas City, Missouri Police Department was told by an informant that the Kansas City Post Office Employees Credit Union would be robbed on May 7, 1982. The informant had been present on one occasion when three black males, Jack Rose, Charles Rose, and Vernon Rose, were planning the robbery. The robbers would leave the scene of the robbery in a stolen car, drive to the Liberty Memorial Mall, abandon the stolen car, enter a yellow Camaro driven by a black

female, and drive away from the mall. According to the informant, the yellow Camaro belonged to Jack Rose or his girlfriend. Detective Ericsson stated that he had maintained periodic contact with the informant over the previous two or three years, that the informant had provided him accurate information on eight to ten occasions, and that the information supplied by the informant had led to the arrest of three or four individuals for whom there were outstanding warrants.

Detective Ericsson relayed the informant's story to Sergeant James Kopp, white collar crime division, who, in turn, passed the information on to the robbery unit. The police conducted an independent investigation. They ascertained that Jack Rose had driven or had been a passenger in a yellow 1971 Camaro with license plates YPG–649.[2] Police also observed a yellow Camaro parked in front of Rose's residence on May 7. On May 10, after the May 7 robbery failed to occur, Ericsson again contacted the informant. The informant told him that the robbery was still going to occur but that the Roses were not sure when it would be. Ericsson believes this information was relayed to Sergeant Kopp.

On May 12, 1982, at approximately 10:55 a.m., three masked men entered the front door of the credit union. One of the men, gun in hand, ran toward the manager's office. When the gunman entered the office, the manager, Donald Brooks, was talking to a customer, Hiawatha McCormick. The gunman pushed Brooks to the floor. He then told McCormick and Brooks' secretary, Georgia Crow, to lie on the floor. The gunman crouched beside Crow's desk and began counting aloud.

The other two men ran toward a customer service counter located across the room from the entrance. They jumped onto and over the counter. One robber emptied out

---

1. Prior to his trial, Rose moved to suppress the evidence seized from him and from the car in which he was riding at the time of his arrest. Rose also moved to suppress incriminating statements made to the two bondsmen. After the suppression hearing, the federal magistrate filed reports recommending that the motions be

denied. After an independent review of the record, the district court adopted those reports and recommendations.

2. It later was determined that the car belonged to Rose's sister.

a trash can and dumped money from teller Cindy Green's cash drawer into it. The other cash drawers were locked. Although one of the robbers asked where the rest of the money was located, none of the credit union employees answered. The gunman shouted that it was time to go. The three left through the front door.

Shortly after the robbery, a white Ford LTD was found a few blocks from the Liberty Memorial Mall and the credit union by a police officer who was canvassing the neighborhood for witnesses. The car's motor was running and its windshield wipers were operating. The ignition switch was missing; the car had been hotwired. Patricia Gutierrez, a credit union employee, subsequently identified the white Ford LTD as the car that she saw leaving the parking lot immediately after the robbery. Police later ascertained that the car had been stolen prior to May 12, 1982.

The Ford subsequently was searched at the police department service station after the owner's permission had been obtained. Police discovered various items, including two hooded jackets, two pairs of jogging pants, and a bluejean jumpsuit. Credit union employees had told police that the gunman was wearing a gray sweatsuit and a gray hooded jacket. Another employee described one of the robbers as wearing a loosefitting jacket and pants made of bluejean material.

During the investigation immediately following the robbery, the police observed footprints on the service counter of the credit union. The police dusted the shoe sole impressions with a magnetic brush similar to a fingerprint brush. The prints were recovered by placing fingerprint tape over the impressions, lifting them from the counter and placing them on a card. The police also learned that the stolen money included "bait money." The credit union had a list of the serial numbers of five of the one dollar bills which were in the stolen money.

About an hour after the robbery, Kansas City, Missouri Police Officers Meadows and Ortega, who had heard radio communica-tions about the robbery, the abandoned white Ford, and a possible switch to a yellow Camaro driven by a black female, stopped a yellow Camaro approximately one and a half miles from the credit union. Kathy Davis, a black female, was driving. Jack Rose and Vernon Rose were passengers. Because the radio communications had mentioned that the robbers were armed, the officers "patted down" these individuals after asking them to get out of the car.

Meanwhile, Officers Chrisman and Truman, who were maintaining surveillance of Jack Rose's residence, learned that the Camaro had been stopped and immediately drove to the scene. Arriving within minutes of the stop, they informed Meadows and Ortega that Jack Rose was the name of one of the suspects. The three occupants of the Camaro were placed under arrest and immediately advised of their *Miranda* rights. Following the arrest, Jack Rose and Vernon Rose were searched. Police also searched a woman's purse found in the Camaro. They discovered a roll of money totaling $125.00 in Jack Rose's pocket, $570.00 in Vernon Rose's pocket, and $310.00 in the purse. The three occupants of the Camaro then were transported to the police station. Detective Steve Barfield, who noticed that the pattern on the sole of Jack Rose's shoes was similar to the prints recovered from the service counter, took Rose's shoes and gave them to the evidence technician.

The yellow Camaro was searched on May 18, 1982, pursuant to a search warrant obtained from a state associate circuit judge. The trunk contained a dent puller, a tan jacket, and a pair of tan gloves. There was over $1,090.00 in cash in the tan jacket including the five dollars of "bait money." Trial testimony revealed that dent pullers can be used to remove ignition locks from a car's steering column so that it can be stolen.

## II. *Issues*

### A. *The Arrest and Search of Rose.*

■ Rose contends that the officers did not have probable cause to arrest the

occupants of the Camaro. In appropriate circumstances, law enforcement officers may approach a person for the purpose of investigating possible criminal behavior even though there is no probable cause to arrest the person. *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) [hereinafter *Adams*]; *Terry v. Ohio*, 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968) [hereinafter *Terry*]. A stop is permissible only when officers are aware of facts which, taken together with rational inferences from these facts, reasonably warrant the suspicion that the person stopped has been, is, or is about to be engaged in criminal activity. *E.g., United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981). In addition, officers who are entitled to make a forcible stop may conduct a limited weapons search for the purpose of protecting themselves. *Terry*, 392 U.S. at 24, 88 S.Ct. at 1881.

■ The record supports the district court's conclusion that Officers Meadows and Ortega had sufficient reasonable, articulable suspicion to justify the stop of the Camaro. *See United States v. Pajari*, 715 F.2d 1378 (8th Cir.1983). They had heard radio communications that the credit union had been robbed by three masked black males who were armed, that a white Ford had been discovered abandoned near the credit union, and that there would be a possible switch to a yellow Camaro driven by a black female. Within an hour of the robbery, Officers Meadows and Ortega spotted a yellow Camaro driven by a black female and occupied by two black males. They stopped the car about one and a half miles from the credit union. We believe that the *Terry* stop and weapons "pat down" were well justified in this case.

■ We do not agree with Rose's contention that the investigative stop and weapons "pat down" were in reality an arrest without probable cause. It is true that the determination of whether an arrest has occurred for Fourth Amendment purposes does not depend upon whether the officers announced that they were placing the suspects under arrest. *Dunaway v. New York*, 442 U.S. 200, 212, 99 S.Ct. 2248, 2256, 60 L.Ed.2d 824 (1979). An action tantamount to arrest has taken place if the officers' conduct is more intrusive than necessary for an investigative stop. *See Florida v. Royer*, 460 U.S. 491, ——, 103 S.Ct. 1319, 1328, 75 L.Ed.2d 229, 241 (1983). Here, however, the initial stop and weapons search clearly fell within the permissible ambit of a *Terry* stop. *See Adams, supra; United States v. Beardslee*, 609 F.2d 914 (8th Cir.), *cert. denied*, 444 U.S. 1090, 100 S.Ct. 1053, 62 L.Ed.2d 778 (1980).

We also believe that the roll of cash found in Rose's pocket could have been lawfully discovered during the weapons "pat down." In fact, however, the magistrate found that the roll of cash was discovered during a search of Rose's person following his arrest. Although there was some confusion in the testimony as to the exact moment of the formal arrest and as to which search revealed the roll of bills, there is ample evidence to support the magistrate's findings and we cannot say that they are clearly erroneous. In any event, the discovery of the money on Rose's person was not crucial to the existence of probable cause for his arrest.

■ Once Officers Chrisman and Truman arrived at the scene of the investigative stop with information that Jack Rose was one of the suspects in the robbery of the credit union, there was probable cause to arrest Rose and the other occupants of the Camaro. Probable cause to make a warrantless arrest depends upon "whether, at the moment the arrest was made, ... the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing [the person arrested] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 *quoted in United States v. Capers*, 685 F.2d 249, 251 (8th Cir.1982). It is not necessary that an officer have personal knowledge of all the items of information which, taken together,

constitute probable cause for an arrest without a warrant. *United States v. Rose,* 541 F.2d 750, 756 (8th Cir.1976), *cert. denied,* 430 U.S. 908, 97 S.Ct. 1178, 51 L.Ed.2d 584 (1977). It is enough that "the collective knowledge and information of all of the officers involved" establishes probable cause. *Id.* Based on the totality of information known to the arresting officers, there is no doubt that probable cause was established for the arrests that were made in this case.

### B. *Search of Camaro.*

#### 1. *Standing.*

 The government urges that Rose lacks standing to assert his Fourth Amendment claim regarding the search of the trunk of the Camaro because he had no legitimate expectation of privacy in it. Rose did not own the Camaro nor was he driving it at the time it was stopped. He has not asserted any ownership in the items seized from the trunk of the car. The district court, however, rejected the government's argument. The magistrate found that Rose's sister had given him permission to use the Camaro. Rose, who had keys to both the ignition and the trunk, drove the car as much as two or three times a week. Rose's use of the car on May 12, 1982 was permissive. Although he was seated as a passenger on that day, he had control over the car and had given Kathy Davis permission to drive. The district court's findings are not clearly erroneous and, on the basis of these findings, we affirm the district court in holding that Rose has standing to raise this claim. *Compare United States v. Williams,* 714 F.2d 777, 779 n. 1 (8th Cir.1983) (driver's permissive use of auto provided sufficient expectation of privacy in vehicle); *United States v. Portillo,* 633 F.2d 1313, 1317 (9th Cir.1980), *cert. denied,* 450 U.S. 1043, 101 S.Ct. 1763, 68 L.Ed.2d 241 (1981) (driver who had both permission to use friend's automobile and keys to operate it had standing to contest search of trunk) *with Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) (mere automo-bile passengers who neither owned nor had permission to use automobile had no standing).

#### 2. *Sufficiency of the Affidavit for the Search Warrant.*

 Rose challenges the sufficiency of the affidavit of Detective Darwin Dupree in support of the warrant to search the Camaro. According to Rose, the affidavit did not satisfy the requirements of *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), because it did not set forth any basis for the magistrate to evaluate the informant's statement even though the probable cause determination depended on information provided to police by the informant.

The duty of this court under the standard reaffirmed by the Supreme Court in *Illinois v. Gates,* —— U.S. ——, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), is "to ensure that the magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed." *Id.,* —— U.S. at ——, 103 S.Ct. at 2332 at 548 (quoting *Jones v. United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960)). The task of the magistrate issuing the warrant was:

> to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Id. Gates* does away with the "excessively technical dissection of informants' tips" under the two-pronged test derived from *Aguilar* and *Spinelli. Id.* —— U.S. at ——, 103 S.Ct. at 2329, at 545. *See also In re Grand Jury Proceedings,* 716 F.2d 493, 501 (8th Cir.1983); *United States v. Ross,* 713 F.2d 389, 393 (8th Cir.1983).

We are convinced that the state associate circuit judge had a substantial basis for concluding that probable cause existed for the issuance of the search warrant. Apply-

ing the totality of circumstances analysis to this case, we believe that what the affidavit set forth concerning independent investigation by the police and the subsequent corroboration of the informant's predictions suffices for the practical, common-sense decision required by *Gates.*

According to the affidavit, Sergeant Kopp had relayed the information given by the informant. The informant stated that the Post Office Employees Credit Union would be robbed within a few days of May 7, 1982, that the robbery would be committed by Jack Rose and two other black males, that the robbers would use a stolen car in the commission of the robbery, and that the robbers would switch to a yellow Camaro driven by a black female. The affidavit revealed that police, acting on the tip, discovered that Jack Rose was known to operate a 1971 yellow Camaro bearing Missouri license plate number YPG–649.

The affidavit also stated that the credit union had been robbed on May 12, 1982 by three black males. They were seen leaving the area in a white Ford which subsequently was discovered abandoned near the credit union with the engine running. Radio broadcasts announced the robbery and the discovery of the abandoned Ford and requested that a yellow Camaro known to be operated by Jack Rose be stopped. Approximately a mile and a half from the credit union police stopped a yellow Camaro with Missouri license plate number YPG–649 driven by a black female with two black male passengers including Jack Rose.

▮ Rose argues that the corroboration by actual events of the information provided by the informant could have resulted from the intelligent guesswork of an informant who knew Rose drove a yellow Camaro, who knew he lived with Kathy Davis, and who had heard underworld rumors about the robbery. Probable cause, however, does not require certainty of criminal activity, but only probability. The informant's statements were corroborated by police investigative work and by the details of the robbery. *See Gates, supra; Jones*

*v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959) (arrest without warrant upheld on informant's statement that Draper was peddling narcotics, where police corroborated informant's description of Draper's appearance and where he would be on a given morning).

### C. *Incriminating Statements.*

Rose sought to suppress statements made to two bondsmen, Jeffrey Papa and Jack Hartman, on May 17, 1982, five days after the robbery and Rose's arrest by Kansas City, Missouri police officers. On December 10, 1981, Doris Bonding Company had signed, as surety, a $25,000.00 bond for Jack Rose in the district court of Wyandotte County, Kansas. Rose then was released from custody on a charge of attempted burglary. After Rose failed to appear on May 17, 1982, the court issued a bench warrant for his arrest. Doris Bonding Company hired Papa and Hartman to locate and apprehend Rose.

Papa and Hartman learned that Rose could be found in an apartment in Kansas City, Missouri and that Rose had a gun. With a certified copy of the bond, they went to the apartment, which belonged to Cheryl Johnson. After Papa knocked on the door, he heard noises from inside the apartment, but no one answered the door. He telephoned Doris Bonding Company and learned that Rose was in the apartment because someone from the company had been talking to Rose over the phone while Papa was knocking on the door. Johnson arrived when Papa returned to the apartment door. Papa explained that he was from the bonding company. After Johnson indicated that she did not have a key, Papa kicked the door open.

Papa and Hartman took Rose into their custody and advised him that they were doing so because he had failed to appear in court. After handcuffing him, they left the apartment, placed him in the back seat of Papa's car and drove to the Wyandotte County, Kansas jail. Rose was apologetic

and cooperative. Papa indicated that the atmosphere in the car was cordial.

Shortly after leaving the apartment, Papa and Rose began a casual conversation. Initially, Papa inquired about the gun Rose was supposed to have. Rose told them the gun was at his father's house. At this time, Papa and Hartman had no knowledge of the credit union robbery. During the conversation, Rose indicated that he was sorry he had not appeared in court and stated that he had been afraid that the "feds" were going to pick him up for the credit union robbery. When Papa and Hartman asked what he was talking about, Rose stated that he and his brother Charlie had robbed a post office at 30th and Broadway and that they were driving his sister's car when they pulled the robbery. Papa then specifically asked Rose if the gun used in the robbery was in the apartment. Rose stated the gun was not in the apartment, but the guns used in the robbery were at his father's house and they couldn't be used against him because they were registered to his father. Rose also revealed that the police already had recovered evidence from his sister's car. The following day, Papa contacted the FBI and then gave a written statement to a detective with the Kansas City, Missouri Police Department.

▮▮▮▮ The Fifth Amendment does not apply to the acts of private individuals absent government participation. *See United States v. Wilkinson*, 460 F.2d 725, 735 (5th Cir.1972). *Cf. Gundlach v. Janing*, 536 F.2d 754, 755 (8th Cir.1976). Because Papa and Hartman were acting in a private capacity as agents of the Doris Bonding Company, they were not required to give *Miranda* warnings to Rose. *Cf. Minnesota v. Murphy*, —— U.S. ——, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984) (probation officer not required to give *Miranda* warning). Although the two bondsmen were special deputy sheriffs appointed by the Wyandotte County sheriff pursuant to Kan.Stat.Ann. § 19–805a, they clearly were not acting in that capacity when they entered the State of Missouri and apprehended Rose. In-

stead, Papa and Hartman were exercising on behalf of the bonding company a private contract right outside the jurisdiction of the courts and law enforcement officials of the State of Kansas. *Compare Ouzts v. Maryland National Insurance Co.*, 505 F.2d 547 (9th Cir.), *cert. denied*, 421 U.S. 949, 95 S.Ct. 1681, 44 L.Ed.2d 103 (1975) (Nevada bondsmen acted in their own financial interest and did not act under California law when they forcibly captured individuals in California) *with Griffin v. Maryland*, 378 U.S. 130, 135, 84 S.Ct. 1770, 1772, 12 L.Ed.2d 754 (1964) (state action occurred when deputy sheriff who possessed state authority acted under that authority in ordering black individuals to leave privately owned amusement park pursuant to park's racial policy and in arresting black individuals). In addition, there is sufficient evidence in the record to conclude that Rose's admissions were voluntary, and the district court so found. We hold that it was not error to admit these statements into evidence.

### D. *Admission of Expert Testimony.*

▮▮▮ According to Rose, the district court also erred in allowing Marion McMillan, an employee of the Kansas City, Missouri Police Department, to testify as an expert on the subject of shoe and print comparisons. The decision whether or not to permit a witness to testify as an expert is within the sound discretion of the trial judge. *See, e.g., White v. United States*, 399 F.2d 813, 819 (8th Cir.1968). The ruling of the judge will not be disturbed unless it was an abuse of discretion. *United States v. Wiebold*, 507 F.2d 932 (8th Cir. 1974). We conclude that the district court did not abuse its discretion in allowing McMillan to testify as an expert on this subject.

▮▮▮ Expert testimony should be admitted whenever it "will assist the trier of fact to understand the evidence or to determine a fact in issue...." Fed.R.Evid. 702; *see also Taenzler v. Burlington Northern*, 608 F.2d 796, 798 n. 3 (8th Cir.1979); *Holmgren v. Massey-Ferguson, Inc.*, 516 F.2d

856, 858 (8th Cir.1975). Here, the government offered three exhibits: Rose's right shoe, a test print made from the right shoe, and the shoeprint impression lifted from the service counter of the credit union. In order for this evidence to be relevant to the issues at trial, the government had to show a connection between Rose and the print at the credit union. This could be done only by a comparison of Rose's shoe and its test print with the shoeprint impression lifted from the credit union counter. *See McDonnell v. United States*, 455 F.2d 91, 95 (8th Cir.1972), *cert. denied*, 412 U.S. 942, 93 S.Ct. 2785, 37 L.Ed.2d 402 (1973); *McClard v. United States*, 386 F.2d 495, 500 (8th Cir.1967), *cert. denied sub nom. Ussery v. United States*, 393 U.S. 866, 89 S.Ct. 149, 21 L.Ed.2d 134 (1968). McMillan assisted the jury by explaining the color transposition between the test print made by Rose's right shoe and the shoeprint impression lifted from the counter. *Cf. United States v. Sellers*, 566 F.2d 884, 886 (4th ·Cir.1977) (expert allowed to assist jury's evaluation of surveillance photograph by explaining the effects of light, shadow, and reflections, and the distortion caused by the picture's perspective; also allowed to express opinion whether defendant was the person in the picture). McMillan also provided a method for comparing the test print and the shoeprint impression lifted from the counter. First, he compared the class characteristics of size, shape, and design. If these characteristics had differed, the two prints could not come from the same shoe. Because McMillan found that the class characteristics were the same, he proceeded to a more specific analysis of individual characteristics, such as gouges or splits which would affect the print. Based on individual characteristics, he could conclude that in this instance the test print and the shoeprint impression matched.

McMillan was qualified to testify as an expert on the subject of shoeprint comparisons. At the time of trial, he had been assigned to the Regional Crime Laboratory in Kansas City, Missouri since 1976 as a firearms and tool mark examiner. He has an associate degree and a bachelor's degree and is working on a master's degree in criminal justice administration. In his course work, he has studied firearm and tool mark identification, including shoeprint analysis. He has attended seminars and workshops relating to firearm and tool mark identification. His knowledge in regard to shoeprint examinations comes primarily from contact with other members of his profession and from on-the-job training. He has compared specific shoes with prints in twenty-five to thirty cases over a six-year period. Utilizing the same principles, he has compared tires with tire marks. McMillan belongs to several professional organizations. He receives a newsletter from one, the Association of Firearms and Tool Mark Examiners, which sometimes has articles pertaining to shoeprint comparisons. An expert witness need not be an outstanding practitioner in the field nor have certificates of training in the particular subject. *United States v. Barker*, 553 F.2d 1013, 1024 (6th Cir.1977). *Cf. Holmgren, supra.* McMillan's knowledge of shoe and print comparisons was sufficient to insure that his opinion would assist the jury.

Rose did not offer any evidence discrediting the method of analysis used by McMillan. Although counsel specifically cross-examined McMillan on his identification of several individual characteristics, this attack was directed to the weight of McMillan's testimony and not to the reliability of the method for purposes of admissibility. Absent any evidence discrediting the method used by McMillan, we are unwilling to find an abuse of discretion in allowing McMillan to give an opinion on whether or not the print matched Rose's shoe. *See United States v. Hendershot*, 614 F.2d 648, 654 (9th Cir.1980) (absent evidence specifically discrediting the technique of lifting shoeprints by fingerprint lifting techniques, the shoeprint was admissible). Rose's unhappiness with McMillan's testimony derives from McMillan's conclusion that the print matched the shoe. Under the Federal Rules of Evidence, however,

opinion testimony is not objectionable simply "because it embraces an ultimate issue to be decided by the trier of fact." Fed.R. Evid. 704. *See United States v. McCauley*, 601 F.2d 336, 339 (8th Cir.1979) (per curiam).

### E. *Peremptory Strike.*

In his motion for a new trial, Rose argued that he was effectively denied one of his ten peremptory strikes under Rule 24(b) of the Federal Rules of Criminal Procedure. Following voir dire, three panel members were stricken for cause during a meeting in the court's chambers. The court, the prosecutor, Rose's counsel, Rose, and the court reporter were present. The court then took a recess. The United States exercised its six peremptory strikes and indicated the strikes on the list of veniremen. Rose and his counsel examined the list, consulted, and listed their strikes on the list of veniremen. The court reconvened in chambers outside the hearing of the jury to read the names of the jurors who had not been stricken. Rose elected not to be present even though he was advised that he could be present. Upon returning to open court, the judge announced the members of the jury. Those jurors were seated and the oath was administered. After the judge excused the members of the panel who had not been selected as members of the jury, he directed the jury to return the next morning, gave additional instructions, and excused the jurors for the evening. Rose's counsel then advised the judge that Rose did not want juror number one on the panel because the juror was smirking and laughing at him.

A discussion among the judge, Rose, his counsel, and the United States Attorney ensued. Rose's attorneys explained that they had consulted with Rose and shown him the list of strikes with an explanation that a line drawn through an individual's name meant that the individual was to be stricken. Rose had not objected to the list at that time. His dissatisfaction with juror number one was communicated to counsel only after the impaneling had begun. According to Rose, however, he told his attorneys that he did not want juror number one on the panel early in the consultation process. The court, in questioning Rose, elicited two basic grievances. First, Rose wanted at least two black jurors on the jury panel. (The impaneled jury had only one black member.) Second, Rose did not want juror number one on the jury because he was smirking. Rose wanted juror number one removed and a black person put in his place, preferably juror number five, a black juror who had been struck by the government and who already had been dismissed with other panel members. Alternative solutions to this situation were suggested by the United States Attorney. One solution was to replace juror number one with the alternate. The second solution was to strike juror number one and proceed with eleven jurors. Rose's noncommittal responses to the suggested alternative solutions indicate a willingness to leave the problem to the district court's discretion. The court exercised that discretion by directing that the trial proceed with the jury as already impaneled.

Rose again raised this issue in his motion for a new trial. After a hearing on that motion,[3] the district court concluded that Rose had not been denied a peremptory challenge. The court found that, although Rose was given the opportunity to express his opinion, he had not objected to juror number one prior to the impaneling. The court also concluded that Rose had expressed no desire that two members of the jury be black until after the impaneling began.[4] The district court's findings were

---

3. At the hearing on the motion for new trial, Rose was represented by new counsel because of the conflict created by the dispute over the exercise of the peremptory challenges.

4. Rose also failed to prove systematic exclusion by the United States of blacks from the jury

process. Rose merely showed that the government removed three of five black prospective jurors by peremptory challenge. This was insufficient to establish forbidden discriminatory action. *United States v. Childress*, 715 F.2d 1313, 1320–21 (8th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 744, 79 L.Ed.2d 202 (1984).

not clearly erroneous and we find no abuse of discretion in the denial of the motion for a new trial.[5] *See, e.g., United States v. Rooks,* 577 F.2d 33 (8th Cir.), *cert. denied,* 439 U.S. 862, 99 S.Ct. 183, 58 L.Ed.2d 171 (1978) (abuse of discretion review of trial court's denial of motion for new trial on basis of new evidence); *United States v. Brown,* 540 F.2d 364, 379 (8th Cir.1976) (abuse of discretion review of trial court's denial of motion for new trial on basis of juror qualifications).

### F. *Jeopardy.*

A violation of § 2113(a) requires that the defendant forcefully or violently take money or property that belongs to or is in the custody of a bank or other financial institution. Aggravated bank robbery, the offense under 18 U.S.C. § 2113(d), includes all the elements of § 2113(a) plus the element of assault upon or of placing the life of a person in jeopardy by means of a dangerous weapon or device. Rose argues that the evidence failed to establish that he assaulted someone or put someone's life in jeopardy and thus that his conviction under § 2113(d) must be reversed. We do not agree.

 After examining the record, we are convinced there was a sufficient basis for the jury to find that the lives of Brooks, the credit union manager, and McCormick, a customer, had been placed in jeopardy. The test is an objective one. The question is not whether the credit union employees and customers were put in fear, but whether their lives were placed in danger. *United States v. Thomas,* 521 F.2d 76, 80–81 (8th Cir.1975). A jury may infer that a gun displayed during a robbery was loaded and was capable of causing harm. *Id.* at 81. *See also Morrow v. United States,* 408 F.2d 1390, 1391 (8th Cir.1969). In the instant case, a gun was visibly displayed during the robbery. One witness testified that when the robbers entered the credit union one of them had a gun out and was saying something. Brooks stated that the gunman suddenly appeared in the office doorway with gun in hand, touched him, and suddenly he found himself on the floor. There is no claim that the jury was improperly instructed and we are satisfied that on the evidence presented it was well within the province of the jury to find that the employees and customers of the credit union were placed in an objective state of danger by the use of a drawn gun at the scene of the robbery.

Not finding any error, we affirm Rose's conviction.

---

5. We express no opinion on the scope of the peremptory challenge right or on whether the defendant or his counsel has the ultimate control over the exercise of this right. *Cf. Clark v.*

*Lockhart,* 379 F.Supp. 1320, 1332 (E.D.Ark.), *aff'd on other grounds,* 512 F.2d 235 (8th Cir.), *cert. denied,* 423 U.S. 872, 96 S.Ct. 139, 46 L.Ed.2d 103 (1975).