UNITED STATES of America, Appellee,

v.

Donald Lee MOSS, Appellant.

UNITED STATES of America, Appellee,

v.

Frank Michael DOWNEY, Appellant.

Nos. 76–1191, 76–1192.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 13, 1976.

Decided Nov. 12, 1976.

Certiorari Denied Jan. 25, 1977.

See 97 S.Ct. 822.

Michael B. Stern, St. Louis, Mo., for appellant Donald L. Moss.

Thomas L. Kelly, Ballwin, Mo., for appellant Frank M. Downey.

Richard A. Heidenry, Asst. U.S. Atty., St. Louis, Mo., for U. S.; Barry A. Short, U.S. Atty., St. Louis, Mo., on brief.

Before GIBSON, Chief Judge, MARKEY * and STEPHENSON, Circuit Judge.

STEPHENSON, Circuit Judge.

Donald Lee Moss and Frank Michael Downey appeal their convictions by jury of robbery of a federally insured bank in violation of 18 U.S.C. § 2113(a). They were

---

* The Honorable Howard T. Markey, Chief Judge, United States Court of Customs and Patent Appeals, sitting by designation.

jointly tried and convicted in district court.[1] We affirm the conviction of each defendant.

On October 28, 1975, three men entered and robbed the Chippewa Trust Company, Gravois Facility, St. Louis, Missouri. One of the principals, Ellis Leroy Lepp, pled guilty to a reduced charge [2] prior to trial and agreed to testify against the remaining two defendants, Moss and Downey. Both appellants raise various issues arising from the testimony of government witnesses and one defense witness. In order to understand the context of the issues before us, a brief review of the proceedings at the trial is necessary.

Lepp was the first witness called by the government. He testified to the actions of Downey, Moss and himself prior, during, and immediately following the robbery. Phyllis Western, a former girlfriend of appellant Downey, corroborated Lepp with testimony concerning her knowledge of Downey's and Lepp's planning for the robbery and the activities of appellants Moss, Downey and accomplice Lepp immediately following the robbery. Wilton Eidsen, the owner of Metro Auto Sales, corroborated the testimony of Lepp and Western concerning the acquisition by Downey of two cars, one used in the robbery and the other purchased several hours after the robbery. Eidsen also established that Moss, Lepp and Western were with Downey when the second automobile was purchased. Tellers Karen Breihan and Kathy Gammon and bank custodian John Templin testified concerning the actions of the three robbers during the robbery, although they could make no identification because of the masks worn throughout the robbery. Special Agent George Miller and fingerprint specialist Burwell Driver established that Lepp's fingerprints were found on the glass vault door of the Chippewa Trust Company. Nancy Mullane testified of an incident with Donald Moss and Boyd Hicks at the Chippewa Trust Company approximately six weeks after the robbery in which Moss commented concerning the "set-up" at the bank. Special Agents Jan Lindsey and Herb Northcutt, Jr. of the Federal Bureau of Investigation testified to the statements of Moss and Downey in which both denied any involvement in the robbery.

In his defense Moss called two witnesses. The first witness testified as to Moss' facial appearance and his unpaid debts. The second witness testified about the closing hours of businesses in the Cherokee Shopping District. Downey presented Dr. Leopold Lucas, a court-appointed optometrist, who testified concerning Downey's poor eyesight without eyeglasses.

With this brief review of the testimony in mind, we will first consider the issues raised by appellant Moss. Moss contends that the testimony of Phyllis Western relating two statements made to her by Downey regarding Moss should not have been admitted as they were hearsay and violated Moss' Sixth Amendment right to confront witnesses.[3]

The first statement which Downey made to Western occurred on the morning of the robbery when Downey arrived at Western's apartment. Western testified over the objection of Moss' counsel that Downey told her that Moss was out in the car. The government argues that this statement was admissible under the federal co-conspirator's exception to the hearsay rule.

As a general rule, statements made by a co-conspirator in furtherance of the unlawful association are not hearsay and are properly admissible against all conspirators, whether or not a conspiracy is actually charged. *United States v. Nixon*, 418 U.S. 683, 701, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *United States v. Wixom*, 529 F.2d 217, 220 (8th Cir. 1976); *United States v. Kelley*, 526 F.2d 615, 618 (8th Cir. 1975);

---

1. The Honorable H. Kenneth Wangelin, United States District Judge for the Eastern District of Missouri.

2. Lepp entered a plea of guilty to a reduced charge of larceny of a federally insured bank pursuant to 18 U.S.C. § 2113(c). He was sentenced to eight years imprisonment.

3. Neither Downey nor Moss testified at their trial.

*United States v. Frol,* 518 F.2d 1134, 1136 (8th Cir. 1975). Several commentators have noted that the courts have tended to construe broadly the requirement that the co-conspirator's statement be made in furtherance of the conspiracy. *See* discussion, *United States v. Overshon,* 494 F.2d 894, 899 (8th Cir.), *cert. denied,* 419 U.S. 853, 95 S.Ct. 96, 42 L.Ed.2d 85 (1974). It is certain, however, that the hearsay-conspiracy exception applies only to declarations made while the conspiracy charged was still in progress. *Anderson v. United States,* 417 U.S. 211, 218–19, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974); *Krulewitch v. United States,* 336 U.S. 440, 442–43, 69 S.Ct. 716, 93 L.Ed. 790 (1949); *Fiswick v. United States,* 329 U.S. 211, 217, 67 S.Ct. 224, 91 L.Ed. 196 (1946); *United States v. Smith,* 520 F.2d 1245, 1247 (8th Cir. 1975).

■ Turning to the record before us, Western testified that Downey did not indicate to her why he had come by the apartment that morning. Furthermore, Downey did not then state to her what his intentions were. Downey remained at the apartment only a few minutes and Western stayed at the apartment when he left. In short the record is silent concerning the purpose of Downey's visit. The evidence is clear that the conspiracy to rob the Chippewa Trust Company had begun by this time. The record further shows that Western was privy to prior bank robbery plans. She was with appellant Downey when he cased the bank shortly before the robbery and she was intimately involved in the actions of Moss, Downey and Lepp shortly after the robbery. Under these circumstances the question of whether the statement was in furtherance of the unlawful association is close. We also recognize that an argument can be made that the statement "Moss is out in the car," was not in furtherance of the unlawful association. Assuming arguendo that the statement does not fall within the conspiracy exception and was erroneously admitted into evidence, for reasons discussed later, we hold it was harmless error.

■ The second statement which appellant Moss claims was inadmissible hearsay occurred in the evening hours on the day of the robbery. At trial Western was asked by government's counsel if at some point in the evening Downey stated to her what had happened to Moss' share of the money. Over the objection of Moss' counsel, Western replied that Downey told her that Moss "had already went through all of his money on drugs and he had gave some to Fay." Although it is not clear under what exception to the hearsay rule this statement was admitted, presumably it was the conspiracy exception. However, in light of the events following the morning robbery, we conclude that by the time the statement was uttered, the conspiracy had terminated. It is clear that the proceeds of the bank robbery had already been divided. Downey and the others had met at a restaurant and had continued on to a used car lot where he purchased an auto. Furthermore, a visit to a shopping center as well as a friend's house had been completed. In light of these circumstances we have serious doubt concerning the conspiracy exception's applicability.

■ The government, however, contends that the statement was admissible under Fed.R.Evid. 803(2) which provides for the admission of an otherwise hearsay statement if made by the declarant under the excitement caused by the event. The record reveals, however, that the statement was made several hours after the robbery's completion. The government contends that the evidence clearly established a picture of continuous unrelieved excitement and celebration by Moss, Downey and Lepp such that the statement was an excited utterance. In view of the time factor and the subject matter of the statement, however, we are convinced that the excited utterance exception is not applicable. It follows that the statement was erroneously admitted into evidence. However, this is not the end of our inquiry.

Moss contends that the admission of both of the statements made to Western was crucial to the government's case and devastating to him. The record, however, does

not substantiate this claim. Co-defendant Lepp testified that he and Downey had originally planned a bank robbery. The Chippewa Trust Company was chosen as the target on the day of the robbery. Several weeks earlier a car had been purchased from Metro Auto Sales by Downey and placed in Lepp's name. On the morning of October 28, 1975, Downey arrived at Lepp's apartment and announced that together they would pick up Moss and proceed to the Chippewa Trust Company. They drove to Moss' address and awakened Moss. After a discussion concerning the bank robbery, the three principals, with two nylon stockings in their possession, drove back to Lepp's apartment. After several hours at the apartment, the three drove to the bank. Lepp described in some detail the clothing worn by each defendant and the position each took while in the bank. Moss was positioned just inside the bank door while Downey jumped over the teller's counter and collected the money. Lepp walked over to a glass vault door and upon seeing a man in the vault area, shouted to the others "Let's go." All three immediately left the bank and drove back to Lepp's apartment. The proceeds were then divided among the three and the masks, gloves and gun were burned. Approximately an hour and a half later Moss and Downey left the apartment with the understanding that they would all meet at Sandrina's restaurant. Lepp was chauffeured to Sandrina's an hour later by Phyllis Western, Downey's girlfriend. Later on all parties again met at Metro Auto Sales where Downey purchased a car from Eidsen. Both Moss and Downey had their share of the bank money with them at Metro Auto Sales. Lepp also testified that to his knowledge both Moss and Downey had spent their share of the bank loot by the time of the trial. Finally, Lepp testified concerning his guilty plea to the reduced charge of larceny and his prior record.[4]

The next government witness, Christiana Brant, testified that on the day of the rob-

bery she observed three men sitting in a vehicle next to the Chippewa Trust Company. She was not able, however, to describe the individuals. Two bank tellers and a bank maintenance man testified that three men entered and robbed the bank. No eyewitness identification of the men could be made since all three wore stocking masks. Wilton Eidsen testified concerning two automobile sales he had made to Downey. He stated that Moss, Western and Lepp were present on the lot when Downey purchased the second automobile on October 28, 1975. A fingerprint specialist was then called and he established that Lepp's fingerprints were found on the glass vault door of the Chippewa Trust Company. Finally Phyllis Western, Downey's former girlfriend, testified that sometime prior to the robbery, she and Downey had walked to the Chippewa Trust Company where Downey had remarked that the bank "looked easy" or something similar to that phrase. She testified of overhearing Downey and Lepp discussing the subject of robbing a bank. On the morning of October 28, 1975, Downey had briefly visited her apartment. Later the same day she visited Lepp's apartment and Lepp told her about his participation in the robbery and showed her some money hidden in a mattress. Together they drove to a bar and joined Downey and Moss. There Downey, in the presence of Moss and Lepp, described to her the bank robbery and told her how much money had been taken. Downey stated to her that he had left his glasses in the front seat of the car during the robbery. He also told her of their quick departure from the bank and their subsequent stop at Lepp's apartment. Western, Moss and Downey then left the bar and proceeded to Metro Auto Sales where they were joined again by Lepp. Here Downey purchased a car with money contained in a plastic-like bag located in the glove compartment of Western's car. Western testified that a similar bag of money in the glove compartment belonged to Moss. She knew it was Moss' money because Moss had asked Downey if Downey

---

4. On cross-examination by Downey's counsel Lepp was vigorously questioned about his prior record and his guilty plea to the reduced charge.

had placed "his money in there, too." After the purchase of the car, the group met again at Western's house. From there Moss, Downey and Western drove to the Cherokee Shopping District where Moss purchased some watches and clothes. They traveled from the shopping district to Larry Eagan's apartment. Downey and Moss left the apartment during the evening and subsequently returned with drugs.[5]

■ Although the government's evidence was not without some inconsistencies,[6] based on our reading of the record and on what seems to us to have been the minimal impact[7] of the two hearsay statements on the minds of an average jury, we hold that the error (assuming error was made in the admission of the first statement) in the admission of these statements was harmless. The evidence of guilt was overwhelming. *Brown v. United States*, 411 U.S. 223, 230–32, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973); *Harrington v. California*, 395 U.S. 250, 254, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969).

■ Moss secondly contends that prejudicial error was committed in admitting testimony that a weapon was present during the robbery and in Moss' possession.[8] In substance Moss' argument is that since he was not charged specifically with posses-sion, use or display of a weapon the testimony concerning a weapon on his person during the robbery was prejudicial error. We disagree. While the evidence clearly showed that a weapon was not used during the robbery, having it on one's person would appear to be a form of criminal insurance for the success of the venture. Thus it was probative of intent. *United States v. Campanile*, 516 F.2d 288, 292 (2d Cir. 1975). We are also mindful of the trial court's discretion on questions of admissibility of evidence and we find there was no abuse of that discretion. *United States v. Campanile, supra*, 516 F.2d at 292; *United States v. Skillman*, 442 F.2d 542, 551–52 (8th Cir.), *cert. denied*, 404 U.S. 833, 92 S.Ct. 82, 30 L.Ed.2d 63 (1971).

Moss next argues that the trial court committed reversible error in permitting the government's counsel to question witness Nancy Mullane about statements made by Moss six weeks after the bank robbery had occurred. Mullane was subpoenaed and called as a government witness although she had also been subpoenaed by the defense. She was permitted to testify, over the objection by Moss, that approximately six weeks after the robbery she and Moss and another person named Hicks stopped in

---

5. On cross-examination Western admitted that she denied to the FBI any knowledge of the robbery on three separate occasions but once her relationship fell apart with Downey, she then recontacted the FBI.

6. Both bank tellers and the bank maintenance man testified that the robbers they saw were six feet tall. The special agent for the FBI testified that Moss was five feet seven inches tall. Also there was testimony by one of the bank tellers that it struck her that the robber standing guard at the front door (allegedly Moss) had a moustache. Other testimony established that Moss did not have a moustache during this time frame although he had been burned around his face.

7. It is worthy of note that appellant Moss' own counsel first raised the issue of Moss' expenditure of his share of the bank money on drugs. Moss' counsel questioned Lepp on cross-examination in the following manner:

> Q. Did you not testify, sir, that Moss had spent the money that he received from the bank robbery?

A. I had heard that he spent the money. I didn't know myself, I didn't see him spend it.
Q. Your testimony is you did not know yourself, is that right?
A. Right.
Q. Now, have you ever told anyone what Mr. Moss purchased with his money?
A .I don't recall, no.
Q. You do not recall? Do you recall telling the Federal Bureau of Investigation on November 18th that Moss had spent his money on a new watch and on drugs?
A. No.

8. As a corollary Moss argues that the government's inquiry into whether a shotgun was in his possession six weeks after the alleged robbery was prejudicial error. However, the record reflects that the witness Nancy Mullane was not permitted to answer either of the two questions posed by the government's counsel concerning a shotgun. Furthermore, the trial judge ordered any testimony about a shotgun stricken from the record. Under these circumstances there was no prejudicial error committed.

front of the Chippewa Trust Company. Moss made the statement that "it was stupid the way they [the bank] had it set up." She denied making a statement to the FBI to the effect that Moss wanted Hicks to go with him to rob a bank which was on South Chippewa.

The Federal Rules of Evidence clearly permit the admission of other crimes, wrongs or acts where, as here, they are offered to prove knowledge or intent. Fed.R.Evid. 404(b). Furthermore, we are convinced that the probative value of Moss' actions and statements concerning the setup at the Chippewa Trust Company substantially outweighed any possible unfair prejudice. See Fed.R.Evid. 403. Therefore, the admission of Mullane's testimony was not an abuse of the trial court's discretion. United States v. Wixom, supra, 529 F.2d at 220.

Finally, Moss contends that as a matter of law there is insufficient evidence in the record to sustain Moss' conviction. In light of our discussion of the hearsay statements and their minimal impact on the overwhelming evidence of guilt, we conclude that Moss' contention here has little merit.

Appellant Downey raises several issues, most of them concerning the testimony about his eyesight. The nature of Downey's defense was that his eyesight was such that he could not have been the individual who jumped the teller cage without the benefit of eyeglasses.

On February 6, 1976,[9] Downey requested that the trial judge appoint[10] an optometrist for the purpose of ascertaining Downey's visual acuity. The trial judge deferred action on the request pending introduction of evidence that Downey's eyesight was material to an adequate defense. Downey contends that this deferral denied him due process as well as equal protection

of the law. We disagree. The district court should have wide discretion in appointing experts to aid a defendant in preparing and presenting an adequate defense.[11] United States v. McNally, 485 F.2d 398, 406 (8th Cir. 1973). Based on the likelihood of the defense being raised and the relatively short period of time needed for such an examination, the trial court did not abuse its discretion in deferring action on the request made by Downey.

During the course of the trial the district court ordered an optometrist named Dr. Lucas subpoenaed on behalf of Downey. Downey was examined by Dr. Lucas in the presence of Downey's counsel on Thursday, February 12, 1976. Dr. Lucas testified as a defense witness on Tuesday, February 17, 1976. Downey claims there was insufficient time to evaluate Dr. Lucas' oral statements relating to Downey's vision and consult other experts. The record reveals, however, that Downey did not request additional time to evaluate the oral reports before Dr. Lucas testified nor did he ask for an additional optometrist to be appointed. See United States v. Lincoln, 542 F.2d 746 (8th Cir. 1976).

Finally Downey argues that Dr. Lucas' testimony was inept. Downey claims he was forced to put on as a witness a doctor who lacked expertise and who was unable to explain technical terms and procedures to the jury. This, Downey contends, denied him due process and equal protection plus his right to a fair trial. Again the record shows that no objection was voiced by Downey at trial. Furthermore, although Dr. Lucas' testimony was confusing to some degree, it is worth noting that Dr. Lucas testified that Downey would be able to visually observe, gauge and distinguish objects at a distance of 51 feet (from the witness stand to the back wall of the courtroom) without the use of his

---

9. Trial began on February 10, 1976.

10. Downey was certified as indigent and was appointed counsel.

11. The McNally case concerned the appointing of experts under 18 U.S.C. § 3006A. Although Downey's counsel did not indicate under what authority he was asking the trial court to appoint an optometrist, it can be assumed that section 3006A is applicable.

eyeglasses. He also testified that Downey would be able to see the outline of the courtroom gates (separating the courtroom seats from the witness stand) at a distance of 25 feet. We cannot say that Dr. Lucas was not a qualified expert witness. The trial court did not abuse its discretion in appointing Dr. Lucas and allowing him to express his opinion as an expert. *United States v. Atkins*, 473 F.2d 308, 313 (8th Cir.), *cert. denied*, 412 U.S. 931, 93 S.Ct. 2751, 37 L.Ed.2d 160 (1973); *White v. United States*, 399 F.2d 813, 819 (8th Cir. 1968).

■■■ Downey next contends that the trial judge erroneously refused to allow him to exhibit to the jury special eyeglasses prepared by Dr. Lucas. The defense intended to produce the eyeglasses for the jury's use in determining Downey's visual acuity without glasses. In light of Dr. Lucas' testimony that he did not know what effect the eyeglasses would have on a farsighted or nearsighted person, the trial judge did not abuse its discretion in denying the admission of the eyeglasses.

■■■ Downey argues that the district court erred in allowing testimony of unrelated and irrelevant bad conduct by both defendants. Items not previously discussed herein included (1) testimony by Lepp that commencing about a month before the instant robbery he and Downey had made automobile trips to Kentucky and Pennsylvania for the avowed purpose of bank robberies (which were not carried out) and (2) testimony by Agent Northcutt that Downey, when questioned concerning the source of funds for Downey's purchase of the 1969 Thunderbird shortly after the robbery, stated that he "bought it with proceeds from gambling; namely, poker and from a little bit of stealing." We are satisfied that this testimony was admissible to show preparation, plan, intent, knowledge and identity. Fed.R.Evid. 404(b). It is important to note

also that the trial judge immediately instructed the jury that the defendant Downey was not on trial for any acts not mentioned in the indictment.

Finally [12] Downey argues there was insufficient evidence to support the guilty verdict against him. In light of our discussion of the evidence and the hearsay statement introduced against Moss we conclude that Downey's contention of insufficient evidence has little merit.

Affirmed.

---

12. Downey also argued that the government acted contrary to the law in not disclosing that none of the robbers wore glasses and that Downey allegedly jumped the teller cages and collected the money. The transcript of the hearing on motions indicates, however, that it had been disclosed that Downey had allegedly jumped the teller cages. Also the discussion by Downey's counsel at this hearing indicates that he was aware that the evidence would show that all three principals wore stocking masks and that *none of them wore glasses*. Downey's argument, therefore, has little merit.