**UNITED STATES of America, Appellee,**

v.

**Stephen G. SCHOLLE, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Michael S. NEEDHAM, Appellant.**

**Nos. 76–1276, 76–1343.**

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 8, 1976.

Decided April 12, 1977.

As Amended on Denial of Rehearing
June 6, 1977.

---

Jack Nordby, St. Paul, Minn., for appellant, Stephen Scholle.

Bruce Hartigan, Minneapolis, Minn., for appellant, Michael Needham.

Mel I. Dickstein, Asst. U. S. Atty., Minneapolis, Minn., for appellee; Robert G. Renner, U. S. Atty., Minneapolis, Minn., on brief.

Before GIBSON, Chief Judge, HEANEY and HENLEY, Circuit Judges.

HENLEY, Circuit Judge.

Defendants Stephen G. Scholle and Michael S. Needham were charged with violating the narcotics law of the United States in a three-count indictment returned by the federal grand jury for the District of Minnesota on November 4, 1975. Scholle was charged in Count I with conspiring to import cocaine in violation of 21 U.S.C. §§ 952(a) and 846. Both Scholle and Needham were charged in Count II with distribution of cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, and in Count III of conspiring to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846. Arthur Barrie Watson and Karen Johnson were charged as co-defendants, while Ray Thuftedal and Jeffery Kaufman were named as unindicted co-conspirators. Following a jury trial,[1] Scholle was convicted on Counts I and III and Needham was

1. The Honorable Edward J. Devitt, Chief Judge, United States District Court for the District of Minnesota.

convicted on Counts II and III.[2] Scholle was sentenced to two years imprisonment and Needham to eighteen months, each to serve a special parole term of three years following incarceration.

On appeal the defendants raise numerous evidentiary issues. Having carefully reviewed the record, we find no reversible error.

The facts may be summarized as follows. Ray Thuftedal made two trips to Bogota, Colombia, for the purpose of obtaining cocaine. Prior to the first trip made in November, 1974, he invited Stephen Scholle, a Minneapolis lawyer, to invest in the venture. Scholle declined because Thuftedal had never repaid him the money borrowed during a previous marijuana deal. Upon Thuftedal's return and his resale of the cocaine purchased in Colombia, he repaid Scholle and informed him of plans for a second trip to Bogota. Scholle provided Thuftedal with $1,000.00 in January, 1975, on the eve of Thuftedal's second buying trip to Colombia which resulted in the convictions here being appealed.

During that trip Thuftedal traveled from Colombia to Tijuana, Mexico with one pound of cocaine concealed inside four batteries designed for use in underwater scuba diving equipment. In Tijuana he met Jeffery Kaufman and Jennifer Olsen who smuggled the cocaine-filled batteries across the border into the United States.

When they returned to the Minneapolis area about February 1, 1975, Thuftedal and Kaufman went to Scholle's lake cabin to open the batteries and to cut, weigh and package the cocaine. Stephen Scholle received one ounce of pure cocaine for the money he had invested in the enterprise. These activities formed the basis for the conspiracy to import cocaine charged in Count I of the indictment as well as the conspiracy to distribute cocaine charged in Count III. Count III along with Count II additionally encompassed transactions which occurred from February to September, 1975.

In early February, 1975 Thuftedal and Kaufman encountered defendant Needham at Scholle's cabin when they delivered an ounce of cocaine that Scholle had requested they obtain for a customer-friend of his. Scholle subsequently told Kaufman that Needham was the person receiving his cocaine and that Needham's cocaine was going to Barrie Watson. Scholle similarly advised Thuftedal that he had an outlet for cocaine.

Beginning after Christmas of 1974 Barrie Watson repeatedly procured cocaine from Mike Needham, and in his absence from Karen Johnson, Steve Scholle's girlfriend who lived at Mike Needham's house in Maple Plain, Minnesota. After their final transaction in May, 1975, Watson's payment to Needham was delayed for several months, and Needham told Watson he needed that money to repay Stephen Scholle. Shortly after the payment was made, Watson met Scholle at Needham's birthday party where Scholle shook Watson's hand and thanked him for paying off his debt.

From mid-February to May, 1975, Special Agent Donald Bloch of the Drug Enforcement Administration met in an undercover capacity with Barrie Watson on at least seven occasions, and purchased cocaine from him four different times. During their association, Watson confided to Agent Bloch that his source of cocaine was a lawyer named Steve whose cocaine came from Colombia. Watson related that his own procedure was to deliver money to a man named Mike who lived in Maple Plain and who in turn took the money to a lawyer friend of his named Steve who provided the cocaine.

While a drug transaction was in progress between Watson and Agent Bloch on March 10, 1975, Watson was observed going to the Needham house in Maple Plain followed a few hours later by Needham's arrival at

---

**2.** Defendant Arthur Barrie Watson entered a plea of guilty to a misdemeanor and testified for the government. Defendant Karen Johnson was granted a judgment of acquittal at the close of the government's case. Co-conspirators Thuftedal and Kaufman had been previously convicted of conspiracy to import cocaine under different indictments.

Watson's residence immediately before Watson delivered an ounce of cocaine to Agent Bloch. Later, while Needham was still at Watson's house, Watson informed Agent Bloch that his "source" was inside the house and then Watson entered and returned with another ounce bag of cocaine.

The occurrence of these events was adduced at trial primarily through the testimony of Thuftedal, Kaufman, Watson and Agent Bloch. The government further introduced novel evidence of a computer printout representing a compilation of information concerning cocaine exhibits submitted from the Minneapolis District Office of the Drug Enforcement Administration to the DEA Regional Laboratory from fiscal year 1972 to November 17, 1975. The printout revealed that benzocaine, an uncommon adulterant in cocaine, appeared in only two cases in 1975. Benzocaine had been identified in cocaine seized when Ray Thuftedal was arrested for attempting to sell cocaine on February 4, 1975, and benzocaine had been found as the adulterant in the cocaine purchased from Barrie Watson.

We turn now to the various contentions of defendants Scholle and Needham.

## I

The defendants initially contend that their convictions should be reversed because they were based largely upon the inadmissible testimony of accomplices, or even accepting the accomplice testimony, that the evidence was insufficient to sustain verdicts of guilty. Needham claims that independent evidence of a conspiracy to distribute cocaine was not adequate to support the admission of testimony as to the extrajudicial statements implicating him made by co-defendant Scholle. Scholle complains that the accomplice testimony was uncorroborated, and argues its insufficiency in proving his participation in conspiracies to import and distribute cocaine.

■ The general rule is that statements made by a co-conspirator in furtherance of the unlawful association are properly admissible against not only the declarant but also against his co-conspirators. *United*

*States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *United States v. Graham,* 548 F.2d 1302 (8th Cir. 1977); *United States v. Frol,* 518 F.2d 1134, 1136 (8th Cir. 1975); *United States v. Rich,* 518 F.2d 980, 984 (8th Cir. 1975); Fed.R.Evid. 801(d)(2)(E).

■ For such statements to be admitted, there must be substantial independent evidence that a conspiracy existed. *United States v. Nixon, supra.* As set forth by this court in *United States v. Sanders,* 463 F.2d 1086, 1088 (8th Cir. 1972), the standard for the admissibility of co-conspirator statements requires the showing of a likelihood of illicit association between the declarant and the defendant. The trial judge determining admissibility preliminarily has wide discretion and must be satisfied only that there is independent evidence, credible and sufficient to support a finding of a joint undertaking. The independent evidence of illicit association may be completely circumstantial, or may consist of the conspirators' own conduct and admissions. *United States v. Overshon,* 494 F.2d 894, 899 (8th Cir. 1974).

In the case before us, Needham protests the admission of hearsay testimony including a) that of Thuftedal and Kaufman to the effect that Scholle had told them he distributed cocaine to Needham; b) Watson's statement that Scholle had thanked him for repaying his debt to Needham; and c) Bloch's testimony as to what Watson had told Bloch about his source of cocaine.

■ The record reflects that there was independent evidence showing a likelihood of illicit association between Scholle, Needham and their co-conspirators sufficient to justify the admission of the hearsay statements noted above and other similar ones. For example, there was direct evidence that Needham arrived as the apparent buyer at a time when Scholle expected to distribute cocaine at his cabin, that the two were together on several occasions when cocaine was used at Needham's house, and that Needham, Scholle and Watson discussed undertaking a joint drug project in the future.

As an admission, Needham's request that Watson pay him for a cocaine sale so that he could repay Scholle further inculpated Needham in a conspiracy with Scholle. *United States v. Porter*, 544 F.2d 936 (8th Cir. 1976); Fed.R.Evid. 801(d)(2)(A).

■ Similarly, with regard to Scholle, there is ample independent evidence, including that enumerated above and numerous admissions on his part, to indicate the probable existence of an unlawful endeavor undertaken jointly with Needham and the other co-conspirators.

■ We find that the district court properly exercised its discretion in admitting hearsay testimony of co-conspirators since there was a showing of the likelihood of an illicit association between the defendants and other co-conspirators substantial enough to submit the question of a conspiracy to the jury. *United States v. Nixon, supra.*

■ For a jury to consider such statements, however, it must determine from independent evidence beyond a reasonable doubt that 1) a conspiracy existed; 2) the declarant and the defendant against whom a statement is used were members of the conspiracy; and 3) the statement was made during and in furtherance of the conspiracy. *United States v. Rich, supra* at 984. Once the existence of a conspiracy has been established, even slight evidence connecting a particular defendant to the conspiracy may constitute sufficient proof of the defendant's involvement in the scheme to render him culpable. *United States v. Hassell*, 547 F.2d 1048 (8th Cir. 1977); *United States v. Carlson*, 547 F.2d 1346 (8th Cir. 1976); *United States v. Overshon, supra* at 896. Of course, mere presence or association with conspirators is insufficient to show membership in the conspiracy. *United States v. Graham, supra.*

■ In reviewing a jury determination of guilt, an appellate court is required to view the evidence in the light most favorable to the government and to accept as established all reasonable inferences to support the conviction. *United States v. Moss,*

544 F.2d 954 (8th Cir. 1976); *United States v. Harris*, 546 F.2d 234 (8th Cir. 1976); *United States v. Carlson, supra; United States v. Rich, supra; United States v. Cummings*, 507 F.2d 324, 329 (8th Cir. 1974).

■ Here we find that the jury reasonably could have concluded from the testimonies of Thuftedal, Kaufman, Watson and Agent Bloch that there existed a conspiracy to import cocaine in which Scholle was involved and a conspiracy to distribute cocaine in which both Scholle and Needham were involved.

There was direct evidence from Thuftedal and Kaufman that part of the cocaine from Colombia went to Scholle who distributed it. There was direct evidence from Watson that he purchased and resold cocaine from Needham. This was supported by circumstantial evidence from Agent Bloch based upon his investigation and the attendant surveillance.

■ While the weakest link in the conspiracy to distribute may have been that between Scholle and Needham, the government presented independent evidence previously set forth that was sufficient for submission of the question to the jury and for the jury to infer that the defendants were joined in an unlawful concert of action to distribute cocaine. The fact that the independent evidence was mostly circumstantial does not diminish its effect since circumstantial evidence is intrinsically as probative as direct evidence. *United States v. Carlson, supra; Holland v. United States*, 348 U.S. 121, 140, 75 S.Ct. 127, 99 L.Ed. 150 (1954). Furthermore, it is not essential to the proof of a conspiracy to prove that a defendant knew of or was involved with the detailed activities of all the other conspirators, but it need only be shown that the defendant "knowingly contributed. . . efforts in furtherance of it." *United States v. Jones*, 545 F.2d 1112, 1115 (8th Cir. 1976).

■ Because there was substantial evidence of a conspiracy and Scholle and Needham's participation therein, the jury could properly have considered extrajudicial statements made by the defendants that.

were clearly in furtherance of the conspiracy including Scholle's assurances to co-conspirators Thuftedal and Kaufman to the effect that he had an outlet for the distribution of cocaine in Needham, and Needham's indication to co-conspirator Watson that money from the sale of cocaine went to Scholle as the source of that cocaine. *See United States v. Hutchinson*, 488 F.2d 484, 491 and n. 16 (8th Cir. 1973), *cert. denied sub nom. Ennis v. United States*, 417 U.S. 915, 94 S.Ct. 2616, 41 L.Ed.2d 219 (1974). However, whether the jury actually considered these statements is of no consequence on appeal since the trial judge appropriately instructed the jury concerning the circumstances in which such statements could be considered as to defendants Scholle and Needham. *United States v. Rich, supra* at 984.

■ The proposition that the convictions require reversal because they rest primarily upon the testimony of accomplices Thuftedal, Kaufman and Watson who all had strong incentives for false accusation is unpersuasive. We note only that though there were minor inconsistencies, the inculpatory testimonies of the co-conspirators basically corroborated one another and supported reasonable inferences leading to a verdict of guilty. It was the duty of the jury to determine the credibility of each witness and accord each testimony its proper weight during deliberation of the verdict. *United States v. White*, 451 F.2d 351 (8th Cir. 1971).

■ Similarly, the assertion that even accepting the accomplice testimony it proved only Scholle's possession and sale of cocaine and not his participation in a conspiracy has no merit. The evidence need not exclude every reasonable hypothesis except that of guilt. It need only be sufficient to convince the jury beyond a reasonable doubt that the defendant is guilty. *United States v. Carlson, supra; United States v. Shahane*, 517 F.2d 1173, 1177 (8th Cir.), *cert. denied*, 423 U.S. 893, 96 S.Ct. 191, 46 L.Ed.2d 124 (1975).

II

The defendants next contend that they were prejudiced by being tried jointly. Each asserts denial of his right to confrontation by admission into evidence of extrajudicial statements of the other when neither chose to testify.

■ They rely heavily upon *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), in which the Supreme Court held that an accused's right of confrontation is violated when the trial court admits evidence of a confession by a jointly tried co-defendant which is inadmissible hearsay as to the accused but which implicates both the co-defendant and the accused. Such reliance is misplaced because the *Bruton* rule applies specifically where out-of-court statements are inadmissible hearsay against the accused. *United States v. Kelley*, 526 F.2d 615 (8th Cir. 1975), *cert. denied*, 424 U.S. 971, 96 S.Ct. 1471, 47 L.Ed.2d 739 (1976). In the case before us we have found that the extrajudicial statements made by Scholle and Needham were properly admitted against both. For these circumstances, this court has recognized the following principles.

■ While of utmost importance, the right to confrontation, embracing the right to cross-examine adverse witnesses, is not absolute and is subject to certain exceptions embodied in the hearsay rule. *United States v. Carlson, supra.* When the out-of-court statement of an unavailable declarant is offered under a recognized exception to the hearsay rule, a case-by-case analysis is required to determine whether the application of the hearsay rule exception violates the right of confrontation. *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970). A highly relevant consideration is the degree of prejudice imposed upon the fact-finding process by the declarant's non-availability. *United States v. Rogers*, 549 F.2d 490 (8th Cir. 1976). We should consider whether the out-of-court statement bears traditional indicia of reliability, whether it was crucial to the government's case, whether the jury had an opportunity to weigh the credibility of the extrajudicial

statement, and whether appropriate instructions were given by the trial judge. *Dutton v. Evans, supra; United States v. Rogers, supra; United States v. Kelley, supra.*

In adhering to these principles, this court has held that the *Bruton* rule is not violated and an accused's right of confrontation is not abridged when the extrajudicial statement of a co-defendant is properly admitted as a declaration by a co-conspirator in the course of and in furtherance of the conspiracy, provided the statement satisfies the standards set forth above. *United States v. Carlson, supra; United States v. Kelley, supra.*

The statements here at issue are those Scholle made to Thuftedal and Kaufman to the effect that he distributed cocaine to Needham, and those Needham made to Watson implying that he obtained cocaine from Scholle. Having already determined that the statements of both were properly admitted as declarations by co-conspirators during and in furtherance of the conspiracy, we further find that admission of the statements violated neither defendant's right to confrontation.

Admission of the statements did no violence to the integrity of the fact-finding process. The statements made by both Scholle and Needham were spontaneous and against each declarant's penal interest, thus fulfilling traditional indicia of reliability. The statements, although damaging, were not crucial to the government's case. There was substantial independent evidence establishing that each defendant participated in a conspiracy to distribute cocaine. The jury had an opportunity to weigh the credibility of the extrajudicial statements because Thuftedal, Kaufman and Watson were all available for cross-examination as to whether the statements were in fact made; and the personal knowledge of declarants Scholle and Needham as to the identity and role of other participants was abundantly established by the witness' testimony. Finally, appropriate instructions were given by the trial judge clearly defining for the jury the circumstances under which the extrajudicial statements could be considered.

Admission of the defendants' extrajudicial statements did not impermissibly violate either Scholle or Needham's right of confrontation and the district court did not abuse its discretion in admitting them. Trying the defendants jointly prejudiced neither, and the district court did not err in denying their motions to sever.

### III

Defendant Scholle claims that testimony concerning his participation in a prior marijuana transaction was prejudicial and erroneously admitted into evidence. He objects specifically to testimony given by Thuftedal and Kaufman.

When asked on direct examination why he approached Scholle for funds in preparation for his first trip to Colombia, Thuftedal replied, "a couple years before that I borrowed some money from Steve in order to purchase marijuana and subsequently sell it." Thuftedal further explained what he gave Scholle after selling cocaine from the first shipment, "I repaid him the amount of money I owed him from the prior deal." According to Thuftedal, Scholle's response was "that he would be interested in investing in the deal I was planning on starting," and soon thereafter Scholle invested in Thuftedal's second cocaine-buying trip to Colombia.

Corroborating this, Kaufman testified that Thuftedal had indicated to him that Scholle might be a likely investor for the first trip to Colombia because Thuftedal "said that he had gotten money from him before and he could probably do it again," the money referring "[t]o a previous dope deal, I think." Kaufman additionally stated that when he inquired of Scholle if he intended on investing in the first trip, Scholle had informed him "that he wasn't interested, that it would be good money after bad money."

The government argues that the references to the previous marijuana deal were properly admitted to illustrate the

nature of the Thuftedal-Scholle relationship and establish the immediate context of the offense charged. By explaining why Thuftedal approached Scholle to invest in the first place, why Scholle declined, why Thuftedal paid Scholle from the proceeds of the first trip in which Scholle did not invest, and why Scholle decided to invest in the second trip, it is urged that the disputed testimony was highly probative of Scholle's intent and motive in participating in the conspiracies to import and distribute cocaine. We agree.

The government is precluded from introducing evidence of a defendant's other criminal acts to establish his character, but may offer such evidence to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Fed.R.Evid. 404(b). The admissibility of "other crimes" evidence is within the sound discretion of the trial judge who will base his decision upon a determination that 1) the evidence is relevant for a purpose other than showing the character of the defendant; 2) the proof that the acts were committed by the defendant is clear and convincing; and 3) the probative value of the evidence outweighs the danger of prejudice to the defendants. *United States v. Calvert,* 523 F.2d 895, 906 (8th Cir. 1975), *cert. denied,* 424 U.S. 911, 96 S.Ct. 1106, 47 L.Ed.2d 314 (1976); *United States v. Clemons,* 503 F.2d 486, 489 (8th Cir. 1974).

Testimony concerning Scholle's previous drug-related association with Thuftedal served to complete the story of how Scholle came to be involved in the cocaine conspiracies, and was relevant in showing Scholle's motive and intent in participating therein. While Scholle's loan of money to Thuftedal for marijuana purchases had occurred two years previously, his repayment and thus the completion of the transaction related in both time and context to the conspiracies charged. Thuftedal's firsthand testimony, corroborated by that of Kaufman, provided evidence sufficiently clear and convincing to warrant a jury finding that Scholle was knowingly involved in the prior drug activity. Finally, the probative value of an explanation of the circumstances surrounding Scholle's complicity in the conspiracies to import and distribute cocaine outweighs the danger of prejudice to him which was only minimal, particularly since counsel did not dwell on the "other crimes" evidence but elicited it casually to illustrate Scholle's incentive and intent in joining in the conspiracy. We conclude that the district court did not abuse its discretion in admitting the disputed testimony.

### IV

Defendant Scholle maintains that testimony given by Kaufman before a grand jury was erroneously admitted into evidence at trial as a prior-consistent statement to rehabilitate Kaufman's credibility. As a government witness on direct examination, Kaufman implicated Scholle in the conspiracy. On cross-examination, defense counsel confronted Kaufman with statements, inconsistent with his trial testimony, which exculpated Scholle, and further attempted to show that Kaufman's trial testimony was of recent fabrication made with the improper motive of obtaining preferential treatment with respect to the sentence he was currently serving. On redirect, the government introduced the transcript of Kaufman's grand jury testimony which implicated Scholle in that it referred to an incident at Scholle's cabin when Thuftedal and Kaufman obtained cocaine at Scholle's behest for resale to Needham, and additionally recounted conversations between Thuftedal and Kaufman concerning Scholle's possible financial involvement in the first trip to Colombia.

Evidence of prior consistent statements made by a witness who has been impeached by evidence of his prior inconsistent statements and offered to rebut a charge against him of recent fabrication or improper influence or motive is admissible, constituting an exception to the general rule which excludes such out-of-court declarations. *Hanger v. United States,* 398 F.2d 91 (8th Cir. 1968); *Affronti v. United*

*States,* 145 F.2d 3 (8th Cir. 1944); Fed.R. Evid. 801(d)(1)(B).

Scholle contends that Kaufman's prior consistent grand jury testimony does not fall within this exception because it was given after inconsistent statements were made by Kaufman and after an unpleasant incarceration had improperly influenced him to fabricate the consistent statements. We do not accept the first rationale and the facts do not support the second.

The record reveals that statements made by Kaufman concerning Scholle were indeed contradictory. Through his own conspiracy trial in late September, 1975 Kaufman denied Scholle's involvement in the conspiracy. Shortly thereafter he indicated that he wished to cooperate with the government in its investigation, but changed his mind because he was "sour" about being convicted, and was advised he had nothing to gain. On October 31, 1975, prior to his sentencing on November 4, 1975, and his incarceration in El Reno, Oklahoma Federal Penitentiary, Kaufman testified before the grand jury, inculpating Scholle. In mid-December, 1975, upon being informed that he would be called to testify at Scholle's trial, Kaufman took the initiative to correspond with the government, offering to cooperate in the investigation and conjunctively requesting reconsideration of his sentence. Kaufman subsequently submitted to intensive interrogation, and at Scholle's trial provided the incriminating testimony here in dispute. While Kaufman may have made statements inconsistent with his trial testimony before giving the consistent grand jury testimony, the consistent statements were clearly made prior to his incarceration in El Reno which on appeal is alleged to have motivated Kaufman to fabricate the consistent statements.

This court has rejected the proposition that to be admissible prior consistent statements must have been made prior to the impeaching statements, noting that "this seems an unnecessary refinement." *Hanger v. United States, supra* at 104. The court observed that:

. . . [W]e think that in the situation where a key witness admittedly changes his story or his recital of important relevant events and admits that his former statements in regard to the proceedings in question were a fabrication, that he should be allowed to not only testify as to what he now swears is a true recital of events, but to also testify as to the reasons for his fabrication and the reasons why he decided to change his story; and all of the incidents and factors that shed light upon his credibility, both pro and con, are admitted, subject to the court's discretion, and left to the jury for its evaluation and determination.

*Id.* at 105.

■ The district court acted within its sound discretion in allowing the jury to hear both the inconsistent and consistent statements in order to evaluate their relative trustworthiness.

V

Defendant Scholle attacks the manner in which witness Barrie Watson was rehabilitated, and asserts that the government was improperly allowed to introduce evidence of a specific instance of conduct by Watson to support his credibility in violation of Fed.R. Evid. 608(b).

As a government witness under direct examination, Watson implicated defendants Scholle and Needham in the conspiracy. On cross-examination defense counsel attempted to impeach Watson by showing he had a self-interest in testifying against Scholle and Needham, alleging that he had negotiated with the government a reduced plea in exchange for fabricated testimony. The defense questioning further insinuated that Watson was an experienced drug dealer who had successfully·extricated himself from previous prosecutions in return for perjured testimony.

The government undertook to rehabilitate Watson by calling Agent Bloch who testified that Watson had provided reliable information which had enabled the Drug Enforcement Administration to conduct a

successful search of a large, illicit methaqualone drug factory in St. Louis. The government contends that this evidence was proffered to the court to rebut the assertion that Watson had a motive to fabricate testimony against Scholle and Needham by establishing that Watson's negotiated plea was based not only on the Scholle case but also on the St. Louis drug factory case. In short, the evidence was intended to show that Watson's motive to lie was minimized because the treatment he received in the Scholle case was insured by the valuable, accurate information he gave in the more important methaqualone factory case.

▮▮▮▮▮ To the extent that Agent Bloch's testimony merely went to negative the showing of Watson's self-interest its admission perhaps did not transgress Rule 608(b) which regulates evidence concerning the veracity character of a witness by restricting inquiry into prior deceptive conduct to cross-examination rather than extrinsic testimony. In some circumstances the prohibition against extrinsic testimony may not apply to the evidencing of such qualities as bias or interest which do not involve the issue of moral character until an extreme form of corruption has been reached. 3A Wigmore, Evidence, § 977 (Chadbourn rev. 1970); 4 *Id.*, § 1107 (Chadbourn rev. 1972).

The vigorous cross-examination of Watson by the defense, however, may have gone beyond a mere revelation of Watson's self-interest to a generalized attack on his character for truthfulness. By use of impeaching questions pointing to individual incidents of previous misconduct on Watson's part for which he received little if any penalty, the defense perhaps did more than simply insinuate that Watson was a professional drug dealer with a corrupt character who in past cases as well as the present one protected himself by adeptly "cutting deals" with the government, *i. e.*, offering

fabricated testimony in exchange for a lesser charge or none at all.

▮▮▮▮▮ While evidence of good character for truth is logically relevant to meet an impeachment accomplished through a slashing cross-examination carrying strong accusations of misconduct and bad character, which, as here, the witness' denial would not remove from the jury's mind, we are unconvinced that admission of Agent Bloch's testimony was authorized.[3] But even if the admission constituted a technical violation of Rule 608(b), we are satisfied that it was not so prejudicial as to require reversal. *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *United States v. Stabler*, 490 F.2d 345 (8th Cir. 1974); Fed.R.Crim.Proc. 52(a). *See Homan v. United States*, 279 F.2d 767 (8th Cir. 1960); *Kauz v. United States*, 188 F.2d 9 (5th Cir. 1951).

In this connection we have noted the vigor of the cross-examination of Watson and we note that the trial judge prevented unnecessary elaboration by Agent Bloch after Bloch's point had been made before the jury. And finally we note that while Watson's credibility was the subject of oral argument to the jury, the argument was unobjectionable and unobjected to.

## VI

Defendant Scholle finally protests the introduction into evidence of the computer printouts and the accompanying testimony of Donald Johnson, Section Chief of the Investigative Service Section of the Drug Enforcement Administration. The printouts were the product of a computer retrieval system called System to Retrieve Information from Drug Evidence (STRIDE) which was developed by Mr. Johnson who testified as to its operation. The system computerizes the physical characteristics of drugs seized and tested in eight regional laboratories across the country. Its input includes types of drugs, their potency, components, dilutants, location collected, date

---

**3.** There is some support for the proposition that if the judge considers that fairness requires it, he may permit evidence of good char-

acter, a mild palliative for the rankle of insinuation by such cross-examination. McCormick, Evidence, § 49 at 104 (2d ed. Cleary ed. 1972).

analyzed, packaging information and price. The information so compiled is retrieved by Mr. Johnson on a daily basis to determine what elements current drug traffic might have in common in an attempt to detect new trends, new drugs, or any other information to which state and local drug enforcement agencies should be alerted such as a tie-in pointing to a possible conspiracy involving a particular drug.

Through Mr. Johnson the government introduced a STRIDE printout reflecting information concerning cocaine received from the Minneapolis DEA District Office via the DEA Regional Laboratory from fiscal year 1972 to November, 1975. It indicated that benzocaine had appeared as an adulterant in cocaine in only two cases in 1972 and not again until 1975 when benzocaine was identified twice, in the cocaine seized when Ray Thuftedal was arrested in February and again in the cocaine Barrie Watson sold to Agent Bloch.

In introducing the computer printout and Mr. Johnson's explanation of it, the government sought to establish the inference that the cocaine Watson was selling at the distribution end of the conspiracy was the same cocaine Thuftedal had acquired at the importation end of the conspiracy, thus evidencing the chain of conspiracy in which Scholle and Needham had been implicated by independent evidence. The government contends the computer evidence was properly admitted as compilations of business records. The defense argues that the computer printout along with Johnson's testimony was admitted erroneously in that it was without foundation, was irrelevant and prejudicial.

The determination of relevancy concerning the computer evidence was within the broad discretion of the trial judge. *United States v. Johnson*, 516 F.2d 209 (8th Cir.), *cert. denied*, 423 U.S. 859, 96 S.Ct. 112, 46 L.Ed.2d 85 (1975); *United States v. Mitchell*, 463 F.2d 187 (8th Cir. 1972), *cert. denied*, 410 U.S. 969, 93 S.Ct. 1449, 35 L.Ed.2d 705 (1973). The court's acceptance of the evidence was appropriate under the standards set forth in Fed.R. Evid. 401 in that the computer printout may have had a tendency to make the existence of a cocaine conspiracy involving the defendants more probable. We find no abuse of discretion.

In reviewing the foundation established for the reliability of the computer printout evidence, we note that this court has recognized the propriety of treating routinely made and recorded laboratory analyses of drugs as business records admissible under the Federal Business Records Act, 28 U.S.C. § 1732.[4] *United States v. Parker*, 491 F.2d 517, 520 (8th Cir. 1973); *see* Fed.R.Evid. 803(6).

The generally recognized purpose of the Federal Business Records Act, now incorporated into Rule 803(6), was to facilitate the admission into evidence of records which are most probably reliable by dispensing with the necessity of calling the persons who prepared them. *United States v. Parker, supra*; 28 U.S.C. § 1732.

There two basic requirements for a business record to be admissible. The record must have been made in the regular course of business; and the regular course of business must have been to make such records contemporaneously or within a reasonable time thereafter. *United States v. Anderson*, 447 F.2d 833, 838 (8th Cir. 1971).

Although the Act did not mention computer printouts, Rule 803(6) specifically includes a "data compilation." Computer printouts are not intrinsically unreliable, and their use in criminal prosecutions has been upheld. *United States v. Fendley*, 522 F.2d 181 (5th Cir. 1975); *United States v. Russo*, 480 F.2d 1228 (6th Cir. 1973); *United States v. DeGeorgia*, 420 F.2d 889 (9th Cir. 1969).

---

4. Along with the adoption of the new Federal Rules of Evidence in Pub. L. No. 93–595 (Jan. 2, 1975), subsection (a) of 28 U.S.C. § 1732, the subsection herein pertinent, was struck (Pub. L. No. 93–595, § 2(b), 88 Stat. 1949), "since its subject matter is covered in Rule 803(6) relating to records of a regularly conducted business activity." 1974 U.S.C.C.A.N. p. 7091; *see also* 1974 U.S.C.C.A.N. pp. 7087 & 2251.

Even where the procedure and motive for keeping business records provide a check on their trustworthiness (*United States v. Fendley, supra*), the complex nature of computer storage calls for a more comprehensive foundation. Assuming properly functioning equipment is used, there must be not only a showing that the requirements of the Business Records Act have been satisfied, but in addition the original source of the computer program must be delineated, and the procedures for input control including tests used to assure accuracy and reliability must be presented. *United States v. Russo, supra.*

In this case Mr. Johnson, being the founder of STRIDE and qualified by training, experience and position to testify about the system, adequately established that the disputed printouts reflected drug analyses computerized routinely during the regular course of business at the Drug Enforcement Administration, and also described in detail the source of the information upon which the printout was based. The government presented very little evidence concerning the mechanics of how input from eight widely dispersed laboratories is controlled or tested for its accuracy and reliability.

We do not quarrel with the theory underlying the use of STRIDE data in drug investigations or prosecutions. We require only that there be sufficient proof of its trustworthiness as well as an adequate opportunity for rebuttal.[5] In evaluating the admission of the disputed printout, we must consider the reliability of what goes into the computer as well as the reliability of what comes out.

The trial court and counsel engaged in a protracted and in some respects inconclusive dialogue concerning the foundation laid for reception of the computer evidence. We have scrutinized the transcript of this dialogue and of the Johnson testimony with care and are convinced that although the foundation for reception of the evidence could well have been more firm we cannot say that the trial court erred in admitting it. Any evidentiary shortcoming thereafter became a matter of weight to be given to the evidence rather than one of admissibility.

The judgments of conviction against Scholle and Needham are affirmed.

---

5. Ordinarily, defense counsel should be informed in advance of trial as to the nature of computer evidence and the likelihood that it will be offered into evidence so that the defense is afforded an opportunity to prepare a cross-examination or rebuttal. When such an opportunity is not presented, the district court would be well advised, upon proper motion, to grant a continuance to permit the defense time to meet the evidence in an appropriate manner. In this case it is clear that defense counsel knew of the existence of the computer printout prior to trial. It is not so clear that they knew how it was to be used. In any event, no request for a continuance was made.